Rule 23 order filed
December 2, 2015;
Motion to publish granted
January 7, 2016

2016 IL App (5th) 140479

NO. 5-14-0479

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| | ) | Circuit Court of |
| BERNARD R. JOHNSON, | ) | Marion County. |
| | ) | |
|     Petitioner-Appellee, | ) | |
| | ) | |
| and | ) | No. 11-D-214 |
| | ) | |
| JULIE B. JOHNSON, | ) | Honorable |
| | ) | Michael D. McHaney, |
|     Respondent-Appellant. | ) | Judge, presiding. |

_____

JUSTICE STEWART delivered the judgment of the court, with opinion.
Justices Welch and Chapman concurred in the judgment and opinion.

**OPINION**

¶ 1    The respondent, Julie Johnson, appeals the final judgment in this dissolution of marriage action brought by the petitioner, Bernard Johnson, arguing that (1) the valuation of marital assets was against the manifest weight of the evidence and/or the allocation of marital property was an abuse of discretion; (2) the maintenance award was an abuse of discretion; (3) the failure to award her her attorney fees was an abuse of discretion; and (4) she is entitled to a new trial based on the cumulative effect of the errors.  For the reasons that follow, we reverse and remand for a new trial on the issues of the valuation

1

of marital assets, the distribution of marital property, the amount of permanent maintenance to be awarded to Julie, and whether she should be awarded attorney fees.

¶ 2                              BACKGROUND

¶ 3    The parties married on February 11, 1985, and have two adult sons, Josh and Blake. They have had a family business, First State Financial Group, Inc. (FSFG), since 1989. Bernard is a financial and investment advisor. Throughout the marriage, Julie worked as one of Bernard's assistants and was also the primary caregiver for the parties' sons. The parties separated on November 14, 2011, after almost 27 years of marriage. Bernard filed his petition for dissolution of marriage on November 18, 2011. Around that same time, he locked Julie out of FSFG, leaving her unemployed.

¶ 4    The court entered a temporary agreed order on November 16, 2012. Pursuant to that order, Bernard was to manage the parties' rental properties and keep the rental income. Julie was to have temporary exclusive possession of the marital home. Bernard agreed to pay Julie $5,500 per month in temporary maintenance and a $5,608.49 advance property settlement. He also agreed to pay the mortgage payments on the marital home; the loan payments on the parties' subdivision lots; the utility bills, real estate taxes, and reasonable maintenance and upkeep on all properties; Julie's cell phone and cable bills; and all of the parties' health, automobile, and homeowner's insurance premiums.

¶ 5    Bernard filed a petition for nonminor child educational expenses on June 3, 2013. He asked that Julie be ordered to contribute toward Blake's college expenses.

¶ 6    Shortly before trial, Julie filed a petition for interim expert fees and costs, alleging that Bernard had retained business valuation experts, who had generated a report giving

their expert opinions as to FSFG's value; that she needed to hire an expert to do the same; that she had hired an expert for that purpose; and that the cost for the expert's services would be approximately $10,000. The court granted the petition in part, ordering Bernard to pay $3,500 toward Julie's expert fees as an advance property settlement.

¶ 7 Five days before trial, Bernard filed a motion to continue the trial, alleging that he had used FP Transitions as a valuator for FSFG, that valuations had been exchanged in discovery, and that representatives of FP Transitions had recently advised him that they would not testify in divorce matters and had only provided the valuations for FSFG's benefit in evaluating its own income and assets and transfers and sales between businesses. The court ruled that Bernard would be allowed to retain a valuation expert, that the trial would begin as scheduled, that the court would hear the available witnesses/evidence, and that the trial would then be continued.

¶ 8 Before trial, both parties filed financial affidavits. They also filed statements of proposed property distribution.

¶ 9 The bench trial was held on October 30 and 31, 2013. The parties were the only witnesses to testify. The pertinent evidence can be summarized as follows.

¶ 10 At the time of trial, the parties were each 49 years old and had been married for over 28 years. When they married, they were sophomores in college and had part-time, minimum-wage, jobs. Julie soon became pregnant with Josh, and the parties agreed that she would curtail her career plans and education to be his primary caregiver. When he was three years old, Julie again enrolled in college, but she soon became pregnant with Blake, which interrupted her education. During the marriage, Bernard completed a

bachelor's degree in business and obtained a financial paraplanner certificate, nine different securities licenses, and five different insurance registrations.

¶ 11    In 1989, Bernard and two partners started FSFG, which is an S corporation with its principal place of business in Centralia, Illinois.  The partners left within a year, and Bernard bought their shares.  He manages clients' investment accounts, advises them on their portfolios, and does some estate planning and tax planning.  He works for himself, but he works, or sells, through a broker/dealer, Wells Fargo Advisors Financial Network (Wells Fargo).  At the time of trial, he had 265 clients and was managing approximately $78 to $79 million.  He was also selling long-term care and life insurance.  He is paid on a combination of fees and commissions.  He receives a base salary of $4,000 per month from FSFG.  At the time of trial, FSFG had two full-time employees other than Bernard.

¶ 12    Bernard initially worked, or sold, through Investment Planners, another broker/dealer, for approximately 10 or 12 years.  After that, he was employed by Morgan Stanley, another broker/dealer, for approximately three years.  In May 2006, he began working, or selling, through Wachovia, which Wells Fargo bought in 2008 or 2009.

¶ 13    Wells Fargo pays Bernard by sending a wire deposit to his personal checking account at Peoples National Bank.  He then transfers the funds, usually that same day, to FSFG's business checking account at Peoples National Bank.

¶ 14    Bernard also sometimes deposits rental income or money from his business line of credit into FSFG's account as a capital contribution when necessary to cover expenses.  A list of those contributions for 2012 and part of 2013 was entered into evidence.

¶ 15 As one of Bernard's assistants at FSFG, Julie did whatever she could to save him time. For example, she made appointments, greeted clients, made coffee, managed the calendar, ran errands, helped clients with computer access to their investment accounts, helped market the business by assisting with mailers and seminars, and helped do the paperwork to move client accounts when Bernard changed firms. She usually worked 10 to 15 hours per week and left at 3 p.m. to pick up their sons, but there were periods of time when she worked a tremendous number of hours. There were periods of time when she received a salary, and there were periods of time when she did not.

¶ 16 Julie also helped Bernard entertain clients. They hosted many parties and gatherings for clients and friends in their home and at places like the Ritz Carlton in St. Louis, Missouri; the Hilton Garden in Effingham, Illinois; and Popeye's Restaurant Chophouse in St. Rose, Illinois. They held a political fundraiser for Congressman John Shimkus in their home, which clients attended. Julie planned and organized all of the parties and gatherings. She accompanied Bernard on trips, dinners, and functions with clients to help entertain them. She read the local paper for information about clients or their families, sent them personal letters, and attended their parties and funerals.

¶ 17 Julie was also very active in the community and attended many social, sorority, church, and community functions. Bernard acknowledged that he got business as a result of Julie's community involvement.

¶ 18 The parties' personal income tax returns for 2006 through 2012 were entered into evidence. According to those returns, the parties' adjusted gross income for those years

was as follows: $121,543 in 2006; $170,068 in 2007; $151,831 in 2008; $176,756 in 2009; $198,158 in 2010; $317,006 in 2011; and $216,078 in 2012.

¶ 19 Bernard testified that he always files for an extension and that he always files FSFG's income tax returns on September 15 and the parties' income tax returns on October 15. Because the parties do not prepay their taxes, they always owe money when they file their returns.

¶ 20 Bernard stated that he filed the parties' 2012 joint income tax returns without Julie's signature because she would not cooperate by taking her information to his accountant, and it would cost them an additional $16,000 if they filed as married filing separately. He attached a letter to the return explaining that they were going through a divorce and that they would file an amended return. At the time of trial, they still owed approximately $19,000 in taxes for 2012.

¶ 21 FSFG's income tax returns for 2009 through 2012 were entered into evidence. According to those returns, FSFG had gross revenues of $401,869 in 2009, $401,056 in 2010, $413,995 in 2011, and $478,450 in 2012.

¶ 22 On August 15, 2012, Bernard expanded his Centralia business by purchasing client accounts from the estate of an Evansville, Indiana, Wells Fargo advisor, who was killed in an accident. He stated that he bought the Indiana accounts but not the business and that he had an office in Evansville but did not own the building. The purchase included two components, a consulting fee agreement and an asset purchase agreement.

¶ 23 Bernard testified that he initially paid $460,000 for the Indiana accounts. He used his business line of credit for the $100,000 down payment. Before the purchase, the line

of credit had a zero balance. At the time of trial, it had a balance of approximately $105,000 or $106,000, which he was willing to assume.

¶ 24 Bernard stated that the balance of the purchase price, or $360,000, "was set up on a five year personal note with an asset reduction one time trigger should there be accounts leave" during the initial six months after the date of purchase. A little over $12 million of account values left during the six-month period, and the personal note was reduced accordingly. An adjusted amortization schedule after the six-month period, which was entered into evidence, shows a beginning loan amount of $260,273.92 and requires monthly payments of $5,060.83 for 58 months, which FSFG had been making.

¶ 25 FSFG had $478,000 in gross income in 2012, including income from the Indiana accounts from August 15 through December 31, 2012. However, FSFG's 2012 federal income tax return showed a $115,000 deduction for consulting fees, which Bernard explained was "an expense that applies to the transition of the [Indiana] accounts." He testified that the consulting agreement was for the deceased advisor's son, who was licensed and working in the business, to stay on and introduce him to clients so he could develop relationships with them and they could retain as many clients as possible. He stated that the deceased advisor's son was still working with him and that the consulting fee was "part of the total purchase."

¶ 26 Bernard testified that there are two types of general accounts, advisory accounts, which are fee-based, and transactional, or commission-based, accounts. His Centralia accounts were primarily fee-based, but the Indiana accounts were all transaction-based. He stated that the Indiana advisor was "doing business like it was done 25 years ago" and

had to make a trade, *i.e.*, sell something or buy something, to generate revenue. In contrast, with fee-based accounts, like those in Bernard's Centralia office, the advisor has discretion to manage the accounts. He testified that because the Indiana accounts were all transaction-based, their value from an asset standpoint was "exceptionally lower than [his] Centralia business." He was trying to transfer the Indiana accounts to fee-based.

¶ 27 Bernard acknowledged that he was hopeful that he would have more earnings as a result of buying the Indiana accounts. However, he testified that he had "no idea" how much his income would increase because the accounts were all transaction-based.

¶ 28 Julie suggested that FSFG be sold and the proceeds divided. Alternatively, she asked that Bernard be ordered to pay her one-half of FSFG's value after the deduction for personal goodwill.

¶ 29 The parties' property distribution proposals stated that the value of the marital home at 19 Clearlake in Centralia, which both parties wanted, was $380,000. Bernard testified that he agreed with that value, but he acknowledged that, in his financial affidavit, he stated that the value of the home was $417,000. He testified that approximately $237,000 was still owed on the home.

¶ 30 Bernard had the parties' other properties appraised in 2012. He paid a total of $4,900 for the appraisals.

¶ 31 FSFG operated out of a building the parties owned at 902 East McCord in Centralia, which was appraised at $94,000. Bernard wanted to keep operating FSFG out of the building and asked that it be awarded to him. Julie suggested that it be sold and the proceeds divided.

¶ 32    The parties also owned 12 vacant lots in Centralia. Eight of the lots, which were in a subdivision, were appraised at a total of $66,000, but they had been listed for sale for over 10 years and had not sold. Bernard stated that they owed approximately $39,000 on those lots. The other four lots were appraised at a total of $50,000, but they had been listed for sale for over two years and had not sold. Bernard asked that all of the lots be awarded to Julie. She suggested that the lots be sold and the proceeds divided.

¶ 33    The parties also owned a lake house at 1825 Nelson Lane in Centralia, which was appraised at $85,000. Bernard used the lake house as collateral for his business line of credit, which he used to make the down payment on the Indiana accounts. He asked that Julie be awarded the lake house and vacant lots and stated that he could remove the encumbrances from those properties by consolidating the debts on them with the loan on the marital home. Julie asked that the lake house be sold and the proceeds divided or that it be awarded to Bernard. Bernard had no objection to selling it and indicated that the tenant had expressed an interest in buying it, but he stated that he was obligated to put in a more permanent road at the lake house, at a cost of approximately $22,000.

¶ 34    The parties also owned rental properties in Centralia, including houses at 910 and 918 East McCord and a duplex at 507 and 509 East 4th, which were appraised at a total of $108,000. Bernard asked that Julie be awarded the rental properties, which were all rented except the one he was living in. He stated that the monthly rental income totaled $2,075 but acknowledged that the net income from the rental properties was only $7,118 in 2012. He testified that he had remodeled three of the rental properties during the past

9

year and that he was currently remodeling the fourth one. Julie asked that the rental properties be sold and the proceeds divided.

¶ 35    The parties also owned an oil lease, which Bernard testified usually generated income of between $4,000 and $6,000 per year and generated income of $6,000 in 2012. Bernard did not know the value of the oil lease. Julie asked that it be awarded to her.

¶ 36    An October 23, 2013, printout of the parties' Wells Fargo account statements, which was entered into evidence, shows that they had the following individual retirement accounts: Bernard's account No. 0278 valued at $50,029.09 and account No. 9118 valued at $27,989.70; Julie's account No. 9871 valued at $8,793.24, account No. 8202 valued at $591.29, and account No. 9962 valued at $203.16; and the parties' account No. 5433 valued at $35.62. Bernard asked that the parties be awarded their respective individual retirement accounts. Julie asked that all of these accounts be awarded to her.

¶ 37    The parties also had a $250,000 General American whole life insurance policy, which Bernard testified had a cash value of less than $2,000. They also had a $25,000 Country Companies policy, which he stated had a cash value of between $500 and $600.

¶ 38    Bernard was driving a 2007 Lincoln MKZ, which he bought shortly before trial for $15,000. Julie was driving a 2007 Lincoln MKX, which she testified was worth $9,425. The MKX had been wrecked and needed repairs, and Julie would have to pay a $500 deductible to have it repaired. Bernard also had a 2005 BMW, which had major problems and was worth $2,500. Julie asked that the BMW be awarded to her. Blake had a 2003 Jeep, which the parties agreed was his. FSFG paid for all of these vehicles.

10

¶ 39    A list of the parties' personal property was entered into evidence. Checkmarks were next to the property Bernard wanted, which included personal items; family heirlooms; guns; and his "guy stuff," like gym equipment, pool table, poker table, tools, sports collection, baseball pictures and autographs, golf cart, and golf clubs.

¶ 40    Except for the gym equipment, Julie wanted the contents of the marital home. She asked that Bernard be awarded the gym equipment and that she be awarded gold and silver coins he had taken from the marital home. She asked that she be awarded the golf cart or, alternatively, that it be sold and the proceeds divided.

¶ 41    Bernard testified that Blake was expected to graduate from college in July 2014. Bernard had been giving Blake $1,600 per month and paying for his books, tuition, and other periodic expenses. On his financial affidavit, Bernard estimated that he paid $2,000 per month for Blake's college expenses and car, which he testified may have been low.

¶ 42    Bernard testified that his financial affidavit referenced $14,000 owed in attorney fees. He stated that, by the time of trial, he owed approximately $20,000 in attorney fees and that he had already paid more than that.

¶ 43    Bernard acknowledged that, on FSFG's 2011 income tax return, he had claimed, as a business expense, $12,000 in attorney fees related to these proceedings. He testified that he did not know whether he had claimed additional attorney fees in 2012 or how much of his attorney fees would be claimed as a business expense in 2013.

¶ 44    Bernard acknowledged that FSFG's 2012 federal income tax return showed that, in addition to his $48,000 base salary, he took $174,906 in distributions. He stated that the

11

$174,906 was the amount paid out of FSFG for personal bills and that his "net ordinary business income," which flowed to his personal income tax return, was $131,000.

¶ 45 Bernard testified that, on his financial affidavit, he listed his gross monthly income as $17,170. He explained that, to arrive at that figure, he had deducted "phantom income" from forgivable notes, because he was not constructively receiving those funds. He had also deducted a retirement account distribution that he had used to pay taxes.

¶ 46 Bernard acknowledged that, after he and Julie separated, he entered the marital home and took items from the home, including three guns and gold and silver coins. Although he acknowledged that the coins were at one time valued between $25,000 and $30,000, he stated that that was when the market price of gold was "way up" and that gold was now down about 40% and silver was down about 50%. He also testified that he did not take all of the coins.

¶ 47 At trial, the parties agreed that the property should be divided equally but disagreed as to maintenance. Bernard suggested that Julie be awarded rehabilitative maintenance of $3,000 per month for four years, whereas Julie asked that she be awarded permanent maintenance of $10,000 per month.

¶ 48 The parties testified that FSFG had been paying their health insurance premiums for years. Bernard stated that, during the pendency of the trial court proceedings, he had changed health insurance plans, which the parties had done during an open enrollment period almost every October. When asked if he notified Julie of the change, he said that she got a new card in the mail in December or January.

12

¶ 49    Julie testified that after Bernard told her he wanted a divorce, she was depressed and sought counseling. She was still in weekly counseling at the time of trial and expected to need counseling for some time, at a cost of $130 per week.

¶ 50    Julie also stated that, for approximately 10 years, she had suffered from severe asthma, or chronic obstructive pulmonary disease (COPD), which can be very debilitating. She testified that, since these proceedings began, she had been hospitalized four or five times for COPD or related disorders. In fact, she was hospitalized for one night the week before trial and was given breathing treatments with different steroids. She was sent home with steroids and was still on them at the time of trial. She stated that she was much better the week of trial than she had been the week before.

¶ 51    Julie testified that she had a daily regime of steroids, inhalers, and Singulair. She stated that her asthma had never been controlled, that she was on and off steroids, and that the only time she felt good was after she had been on steroids.

¶ 52    Julie testified that steroids had caused her teeth to chip and that she needed dental veneers because her teeth were cutting her tongue. She stated that she could not afford the dental work and asked that Bernard be ordered to pay for it. She testified that she thought he had dental insurance for her but that she had been required to pay for all of her dental work because she did not have a dental card even though she had begged for one.

¶ 53    Julie stated that her doctor had recommended Xolair injections for her asthma but that the injections were expensive and had to be preapproved by the insurer. The injections were finally approved, but she was only able to have one injection in the latter part of 2011 because Bernard had changed insurance carriers without notifying her.

13

¶ 54   Julie stated that, on one occasion, she went to the pharmacy and her medication, which usually costs between $300 and $400 per month, was $3,500.  She did not get the medication and told Josh what had happened.  Bernard then sent her a new insurance card through Josh.  As a result of not being able to pay for her medication, she did not feel well, could not breathe, and had to go to the emergency room.  She called her doctors and was able to get free samples to get her through that month.  She testified that Bernard had also raised her deductible to $10,000 or $12,000 without notifying her.

¶ 55   Julie testified that she likes to dress nice and accessorize and that Bernard liked her to have luxury things.  She stated that they would go to St. Louis to shop and stay at the Ritz Carlton and that Bernard bought her many nice gifts.  Bernard testified that he bought her a Rolex watch and that he also bought one for himself.

¶ 56   For the past 18 to 20 years, the parties had taken an annual five- to eight-day trip to San Diego, California.  During the last trip, which was shortly before they separated, Bernard had leased a condominium at Coronado Island for one month, which he stated was less expensive than staying one week at the four-star hotel where they usually stayed, which was between $2,000 and $5,000.  They also took several weekend trips each year.

¶ 57   Julie had always told Bernard that she wanted to get a Series 7 license because she did not get to finish her college education.  Bernard sponsored Josh and one of his other assistants to take their Series 7 examination.  When he told Julie that he had leased the condominium at Coronado Island for one month, she asked him if he would sponsor her to take her Series 7 examination and said she could take the study materials to the condominium with her.  According to Julie, he responded, "no, you don't need it."

14

Bernard acknowledged that she had asked him to sponsor her to take the examination but denied telling her no and testified that he "didn't care if she wanted to get it."

¶ 58    At the time of trial, Julie had several unpaid bills.  She had a $2,943.97 balance on her credit card, which she testified she could assume.  She had $10,735.86 in unpaid medical bills before her most recent hospitalization and testified that she thought Bernard should pay all of those bills because he had raised her deductible without notifying her, and he had written her a note indicating that he would pay her medical bills until the divorce was final.  She stated that she had relied upon his promise to pay her medical bills and that the promise would also apply to Dr. Vanessa Cole's $6,998 bill for dental work and Salem Eye Clinic's $405 bill for vision care.

¶ 59    Julie testified that she owed her mother $46,774.05 and her sister $3,000 for legal fees she had incurred in this matter, which they had loaned her the money to pay, and that she had another unpaid legal bill in addition to that.  She asked that Bernard be required to pay those legal fees.  She also had a bill from Northcutt Reporting for $774.05 for the costs of transcribing the parties' depositions, which her mother had paid.  The parties also owed a $514 hospital bill for care Blake had received, which Bernard agreed to pay.

¶ 60    After the parties' testimony, the court admitted their trial exhibits.  The court then continued the trial to give Bernard an opportunity to obtain an expert valuation of FSFG and to allow the parties to conduct evidence depositions of the experts.

¶ 61    The trial court entered an interim order on November 7, 2013.  The court granted Bernard's motion for nonminor child educational expenses, ordering Julie to contribute half of Blake's college education expenses, or $1,000 per month, retroactive to the date

the petition was filed. Her contribution was to be made by a reduction in Bernard's monthly maintenance payments from $5,500 to $4,500. Bernard had a $5,000 credit for the months of June through October, which was to be allocated in the final judgment.

¶ 62 Bernard filed a motion for entry of judgment of dissolution *instanter* on December 16, 2013, asking the court to enter a judgment dissolving the marriage before the end of the year and to reserve the remaining issues. That same day, Julie filed her objections to the motion, and the court entered a judgment, dissolving the marriage on the grounds of irreconcilable differences and reserving the remaining issues.

¶ 63 A telephone status conference was held on April 14, 2014. By docket entry on April 15, 2014, the court ordered the parties to submit business valuation expert reports/opinions, with any written argument related thereto, on or before May 16, 2014. The court indicated that it would then enter judgment on all issues, or, if it needed more testimony or other information, it would coordinate with counsel on a future court date.

¶ 64 Julie's business valuation report was prepared by Melissa A. Gragg, a certified valuation analyst, and Kevin S. Carlie, a certified public accountant and certified valuation analyst, with Stone Carlie & Company. Gragg and Carlie opined that a 100% value of FSFG as of August 31, 2013, was $1,499,711, which they then discounted by 67% for personal goodwill, to arrive at a fair market value of $495,000 for FSFG's enterprise goodwill.

¶ 65 Bernard's business valuation report was prepared by Brent D. Maschhoff, a certified public accountant and certified valuation analyst with Krehbiel & Associates. Maschhoff opined that a 100% value of FSFG as of August 31, 2013, was $785,000,

16

which he then discounted by 75% for personal goodwill, to arrive at a fair market value of $196,250 for FSFG's enterprise goodwill.

¶ 66    Bernard filed a motion to submit his attached written closing argument on May 19, 2014.

¶ 67    The trial court entered its final judgment on May 28, 2014.  In its final judgment, the court awarded Julie rehabilitative maintenance of $2,750 per month for 30 months.  The payments were to begin on July 1, 2014.  As to the valuation of FSFG's enterprise goodwill, which the court acknowledged was the most significant marital asset, the court found that Bernard's expert was more credible than Julie's experts and, thus, gave greater weight to his valuation report.  Accordingly, the court valued FSFG's enterprise goodwill, which was subject to division as a marital asset, at $196,250.

¶ 68    Bernard was awarded the following assets: FSFG at a value of $196,250; the marital home and furnishings at 19 Clearlake at a value of $181,387; the office building, furniture, and equipment at 902 East McCord at a value of $94,000; and the 2007 Lincoln MKZ at a value of $10,500.  The court also awarded Bernard the following assets without assigning a value to them: his coin collection; his gun collection; a sewing basket; Japanese small dishes; a deep freeze; a bookshelf; and his clothing, jewelry, and personal effects.  According to the trial court's values, Bernard was awarded assets with a total value of $482,137.

¶ 69    Bernard was assigned the following debts: the mortgage on the marital home in the amount of $253,613; the loan on the subdivision lots in the amount of $39,719; the 2012 tax liability in the amount of $35,000; the cost of building the road at the lake house

17

in the amount of $21,375; Maschhoff's valuation fee in the amount of $7,000; the appraisal fees in the amount of $4,900; and subpoena fees for his accountant in the amount of $250. According to the trial court's values, Bernard was assigned debts totaling $361,857.

¶ 70 Julie was awarded the following assets: the lake house and furnishings at 1825 Nelson at a value of $85,000; the rental duplex at 507 and 509 East 4th at a value of $40,000; the rental house at 918 East McCord at a value of $38,000; the rental house at 910 East McCord at a value of $30,000; the eight vacant subdivision lots at a total value of $66,000; the four vacant lots at 310 North Lincoln, 714 East McCord, 712 East McCord, and 303 North Pine at a total value of $50,000; the oil lease at a value of $29,612; Wells Fargo account No. 0278 at a value of $50,689; account No. 9118 at a value of $28,350; account No. 9871 at a value of $7,338; account No. 8202 at a value of $484; account No. 9962 at a value of $203; account No. 5433 at a value of $35; the General American life insurance policy at a value of $3,606; the Country Financial life insurance policy at a value of $404; the 2007 Lincoln MKX at a value of $18,000; the 2005 BMW X5 at a value of $2,500; the $5,508.49 advance property settlement from the November 16, 2012, order; and the $3,500 advance property settlement from the October 11, 2013, order. The court also awarded Julie her jewelry, clothing, and personal effects without assigning a value to them. According to the trial court's values, Julie was awarded assets with a total value of $459,229.49.

¶ 71 Julie was assigned the following debts: her $46,774.05 debt to her mother for legal fees, her $3,000 debt to her sister for legal fees, her $10,735.86 in medical bills, her

18

$6,998 dental bill, her $405 vision bill, her $2,943.97 credit card bill, her $774.05 court reporter bill, Blake's $514.70 hospital bill, and the $500 deductible to repair her car. Julie was awarded debts totaling $72,645.63.

¶ 72 On June 12, 2014, Julie filed a motion after judgment in nonjury cases, pursuant to section 2-1203 of the Code of Civil Procedure (735 ILCS 5/2-1203 (West 2012)). The motion was denied on September 2, 2014. Julie filed a timely notice of appeal.

¶ 73                              ANALYSIS

¶ 74 We will first address Julie's argument that the valuation of marital assets was against the manifest weight of the evidence and/or the allocation of marital property was an abuse of discretion. The proper division of marital property rests within the sound discretion of the trial court, and the trial court's property distribution will not be disturbed absent an abuse of discretion. *In re Marriage of Shen*, 2015 IL App (1st) 130733, ¶ 115. An abuse of discretion occurs when no reasonable person would take the view adopted by the trial court. *In re Marriage of Foster*, 2014 IL App (1st) 123078, ¶ 102.

¶ 75 Section 503(d) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/503(d) (West 2012)) requires the court to divide marital property in "just proportions" considering all relevant factors, including a number of statutory factors. The requirement that the property be divided in "just proportions" mandates an equitable, rather than an equal, division of marital property. *In re Marriage of Foster*, 2014 IL App (1st) 123078, ¶ 103. In determining such "just proportions," the court must consider all relevant factors, including the value of the property awarded to each party and each party's economic circumstances upon division of the property. 750 ILCS 5/503(d)(3), (5)

19

(West 2012); *In re Marriage of Foster*, 2014 IL App (1st) 123078, ¶ 103. Therefore, to divide marital property under section 503(d), the court must first determine the value of such property. *In re Marriage of Cutler*, 334 Ill. App. 3d 731, 736 (2002). The valuation of marital property is generally a factual question, which will not be reversed unless it is against the manifest weight of the evidence. *In re Marriage of Hubbs*, 363 Ill. App. 3d 696, 700 (2006). A decision is against the manifest weight of the evidence where the opposite conclusion is clearly apparent or where the trial court's findings are unreasonable, arbitrary, and not based on the evidence. *In re Marriage of Igene*, 2015 IL App (1st) 140344, ¶ 18.

¶ 76 We will first address the valuation of FSFG's enterprise goodwill, which, as the trial court correctly noted, is the parties' most significant marital asset. Determining the fair market value of a closely held corporation is not unlike determining the fair market value of a professional corporation. *In re Marriage of Grunsten*, 304 Ill. App. 3d 12, 17 (1999). The process is inherently subjective. *Id.* As the court explained in *In re Marriage of Gunn*, 233 Ill. App. 3d 165, 183 (1992):

"Placing a fair market value on the professional corporation is an art, not a science, and the court must rely on expert witnesses to assist it in this difficult task. There is no exact formula that can be applied, so the trial court must rely on experts who may differ significantly in both methodology and valuation. The trial court must consider the relevant evidence before it; determine the credibility of the experts, the reasonableness of their testimony, the weight given to each of them,

20

and their expertise in the particular area of valuation; and then determine fair market value."

¶ 77  "Although valuation of a closely held corporation is subjective in nature, the process is obviously much less so when done with the benefit of viewing a similar transaction, particularly when the comparison transaction involves the same property," "because fair value is best measured by what a willing buyer would pay a willing seller in a voluntary transaction." *In re Marriage of Grunsten*, 304 Ill. App. 3d at 17.

¶ 78  As Julie's experts noted, there was a comparable transaction between Bernard and the estate of the deceased Indiana advisor before the valuation date. Julie's experts reviewed the details of the transaction where Bernard purchased the Indiana accounts and found it to be the best indication of fair market value as of the date of the valuation. Accordingly, they used a market-based approach, and, more specifically, the transaction method, to estimate FSFG's value. In determining FSFG's value, they also considered FP Transitions' comprehensive valuations of FSFG dated October 22, 2012 (valuing FSFG at $1,111,000 considering only the Illinois assets under management), and July 8, 2013 (valuing FSFG at $1,247,000 considering both the Illinois and Indiana assets under management). FP Transitions also used a market-based approach as its primary methodology. Julie's experts opined that a 100% value of FSFG as of August 31, 2013, was $1,499,711, which they then discounted by 67% for personal goodwill, to arrive at a fair market value of $495,000 for FSFG's enterprise goodwill.

¶ 79  Bernard's expert acknowledged that FP Transitions is the leading provider of equity, management, valuation, private consulting, and succession planning services for

21

the financial services industry. However, unlike FP Transitions and Julie's experts, who used a market-based approach in their valuations of FSFG, Bernard's expert used the straight capitalization of earnings method to determine FSFG's value. He opined that a 100% value of FSFG as of August 31, 2013, was $785,000, which he then discounted by 75% for personal goodwill, to arrive at a fair market value of $196,250 for FSFG's enterprise goodwill.

¶ 80    In finding Bernard's expert more credible than Julie's experts, the trial court found it significant that he utilized the multi-attribute utility model, which was analyzed by the court in *In re Marriage of Alexander*, 368 Ill. App. 3d 192 (2006). However, the objective of the multi-attribute utility model is to conclude what portion of the total goodwill/fair market value constitutes enterprise goodwill and personal goodwill; it does not address the overall fair market value of the business before the discount for personal goodwill (see *id.* at 195-96).

¶ 81    Here, the trial court had the benefit of a recent transaction, in which Bernard bought the Indiana accounts a year before trial. The original purchase price of the Indiana accounts was approximately $460,000, and the assets under management were approximately $47 million. The assets under management for the Centralia accounts were approximately $44 million before the addition of the Indiana accounts. After the six-month look-back period, the Indiana assets under management were approximately $35 million, and the purchase price was, therefore, adjusted to $366,255.

¶ 82    In its judgment, the trial court ignored the Indiana transaction and valued the enterprise goodwill of FSFG (with assets under management of approximately $75

22

million as of August 31, 2013) at $196,250, which is less than what Bernard paid for only the Indiana accounts (with assets under management of only approximately $35 million) a year before trial. Moreover, Bernard testified that the value of those Indiana accounts, from an asset standpoint, was significantly less than the Centralia accounts because they were transaction-based. The court's valuation of the enterprise goodwill of FSFG at $196,250 when it had approximately $75 million in assets under management was against the manifest weight of the evidence where Bernard purchased the less valuable transaction-based Indiana accounts with only approximately $35 million in assets under management for $366,255 a year earlier.

¶ 83   Bernard testified that $115,000 of the $366,255 paid for the Indiana accounts was a consulting fee, whereby the deceased advisor's son was to stay on and introduce him to clients so he could retain as many clients as possible. Even if we assume that the $115,000 consulting fee was for personal goodwill and subtract it from the purchase price of $366,255, this still leaves a value of $251,255 for the enterprise goodwill of the Indiana accounts. Based upon all of the evidence contained in the record, it is clear that the value of FSFG's enterprise goodwill at the time of trial had to be more than $251,255 (the $366,255 Bernard paid for only the less valuable Indiana accounts a year before trial minus the $115,000 consulting fee). The trial court's valuation of the enterprise goodwill of FSFG (including both the Illinois and Indiana accounts) at $196,250 was, therefore, against the manifest weight of the evidence.

¶ 84   Because the trial court's valuation of FSFG's enterprise goodwill, the parties' most substantial asset, was against the manifest weight of the evidence, we reverse that

23

valuation and remand for a new trial on the issue of the proper valuation of FSFG's enterprise goodwill. Moreover, had the court properly valued FSFG's enterprise goodwill, it would have increased the net assets awarded to Bernard significantly. Because the value of the property awarded to each party is a factor in determining the distribution of marital property, we also reverse the distribution of marital property and remand for a new trial on the issue of the distribution of marital property in light of this valuation error (and other valuation errors discussed below).

¶ 85    We turn now to the valuation of the marital home and the debt thereon. The trial court awarded Bernard the marital home at a value of $181,387 and assigned him the debt on the home in the amount of $253,613, leaving a negative equity of -$72,226.

¶ 86    Before trial, both parties submitted property distribution proposals stating that the value of the marital home was $380,000. At trial, Bernard testified that he agreed with that value, but he acknowledged that in his financial affidavit submitted shortly before trial he stated that the value of the home was $417,000. In her financial affidavit, Julie stated that the value of the home was $380,000. The trial court's valuation of the marital home at $181,387 was, therefore, against the manifest weight of the evidence.

¶ 87    The trial court assigned Bernard the debt on the marital home in the amount of $253,613. In his financial affidavit, Bernard stated that the debt was $235,000. At trial, he testified that the debt was approximately $237,000. In her financial affidavit, Julie stated that the debt was approximately $220,000. The court's finding that the debt on the marital home was $253,613 was, therefore, against the manifest weight of the evidence.

24

¶ 88 Had the trial court properly valued the marital home and the debt thereon, it would have increased the net assets awarded to Bernard significantly. On the marital home alone, Bernard received the benefit of a $252,226 calculation error (the court had his equity in the home as -$72,226 when it should have been approximately $180,000).

¶ 89 We turn now to the valuation of the oil lease. The trial court valued the oil lease, which was awarded to Julie, at $29,612. In his financial affidavit, Bernard listed the value of the oil lease as "unknown." No evidence was presented at trial as to the value of the oil lease, but, after trial and without leave of court, Bernard's counsel attached a valuation report to his written closing argument, which the court then erroneously relied upon in valuing the oil lease. Nothing in the record indicates any agreement by the parties to submit this valuation report as evidence. The trial court's valuation of the oil lease at $29,612 was, therefore, against the manifest weight of the evidence.

¶ 90 We turn now to the valuation of the gold and silver coins. The trial court did not value the gold and silver coins Bernard took from the marital home after the parties' separation, which he acknowledged during his testimony were at one time valued at between $25,000 and $30,000, and, instead, awarded them to Bernard without assigning a value to them. In her financial affidavit, Julie stated that the value of the coins Bernard had taken from the home was $23,000 and that she had coins valued at $2,000 in her possession. Instead of valuing the coins based on this evidence, the trial court awarded them to Bernard at no value, which was against the manifest weight of the evidence.

¶ 91 We turn now to the issue of maintenance. It naturally follows that because a new trial is necessary on the issue of the valuation and allocation of marital property, a new

25

trial is also necessary on the issue of the amount of maintenance to be awarded to Julie in this case. Section 504(a) of the Act provides that "the court may grant a temporary or permanent maintenance award for either spouse in amounts and for periods of time as the court deems just *** after consideration of all relevant factors." 750 ILCS 5/504(a) (West 2012). The first factor that the court must consider is "the income and property of each party, including marital property apportioned and non-marital property assigned to the party seeking maintenance." 750 ILCS 5/504(a)(1) (West 2012). The court must consider all relevant statutory factors in establishing a maintenance award. *In re Marriage of Foster*, 2014 IL App (1st) 123078, ¶ 105. Because the ultimate distribution of marital property affects the determination of the amount of maintenance to be awarded, we reverse the trial court's maintenance award and remand for a new trial on the issue of the just amount of maintenance to be awarded to Julie in light of the division of marital property on remand.

¶ 92 However, because the issues Julie raises regarding maintenance are likely to recur on remand, we will briefly address her argument that the maintenance award was an abuse of discretion. At trial, Bernard suggested that Julie be awarded rehabilitative maintenance of $3,000 per month for four years, whereas Julie asked that she be awarded permanent maintenance of $10,000 per month. In its final judgment, the trial court awarded Julie rehabilitative maintenance of $2,750 per month for 30 months.

¶ 93 Determining the propriety, amount, and duration of a maintenance award is within the trial court's discretion, and its decision will not be disturbed absent an abuse of discretion. *In re Marriage of Shen*, 2015 IL App (1st) 130733, ¶ 80. An abuse of

26

discretion exists only where the court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the court. *Id*. Maintenance is designed to allow the recipient former spouse to maintain the standard of living enjoyed during the marriage. *Id.* ¶ 87. Rehabilitative maintenance is appropriate where the evidence shows a potential for future employability at an income that allows approximately the same standard of living established during the marriage. *In re Marriage of Heasley*, 2014 IL App (2d) 130937, ¶ 23. Inherent in the concept of rehabilitative maintenance is the ultimate goal that after renewing or developing skills, or reentering the job market, the recipient former spouse will be able to become self-sufficient through her own income. *Id.* A permanent maintenance award is appropriate, however, where it is evident that the recipient former spouse is either unemployable or has employment skills but there is a discrepancy between her probable future income and the amount of income that would provide the standard of living she enjoyed during the marriage. *In re Marriage of Heroy*, 385 Ill. App. 3d 640, 652 (2008). In addition, permanent maintenance is generally appropriate where a spouse has devoted significant time to raising a family instead of pursuing a career. *Id.*

¶ 94 The factors the court must consider in determining the propriety, amount, and duration of a maintenance award include: (1) each party's income and property, including marital property apportioned and nonmarital property assigned to the party seeking maintenance; (2) each party's needs; (3) each party's present and future earning capacity; (4) any impairment of the present and future earning capacity of the party seeking maintenance due to that party devoting time to domestic duties or having forgone or

27

delayed education, training, employment, or career opportunities due to the marriage; (5) the time necessary to enable the party seeking maintenance to obtain appropriate education, training, and employment, and whether that party is able to support herself through appropriate employment; (6) the standard of living established during the marriage; (7) the duration of the marriage; (8) the parties' age and physical and emotional condition; (9) the tax consequences of the property division upon the parties' respective economic circumstances; (10) contributions and services by the party seeking maintenance to the education, training, career or career potential, or license of the other spouse; (11) any valid agreement of the parties; and (12) any other factor that the court expressly finds to be just and equitable. 750 ILCS 5/504(a)(1)-(12) (West 2012). We will consider each of these factors in turn.

¶ 95    The first factor is each party's income and property, including marital property apportioned and nonmarital property assigned to the party seeking maintenance. As the trial court acknowledged, FSFG is the parties' most substantial asset, and it was awarded to Bernard. On remand, it will most likely again be awarded to Bernard because it is a financial services firm, and he is the only party with the necessary qualifications to provide financial advice to clients.

¶ 96    FSFG had gross revenues of $401,869 in 2009; $401,056 in 2010; $413,995 in 2011; and $478,450 in 2012, which included only 4½ months of revenue from the Indiana accounts. Bernard's adjusted gross income from FSFG was $176,756 in 2009, $198,158 in 2010, $317,006 in 2011, and $216,078 in 2012. Therefore, Bernard will most likely have annual income of over $200,000 from FSFG, whereas Julie is

28

unemployed. Therefore, this factor favors an award of permanent and substantial maintenance.

¶ 97 The second factor is the needs of each party. In his financial affidavit, Bernard shows net monthly income of $12,164 and total monthly living expenses of $10,192.07, which leaves $1,971.93 available for payment of maintenance. He also shows $2,000 per month being paid for Blake's college tuition, car, and gas, which will no longer be necessary as Blake was expected to graduate from college in July 2014. Bernard will, therefore, be able to maintain the same standard of living the parties enjoyed during the marriage even if he is ordered to pay Julie a reasonable permanent maintenance award. Julie, on the other hand, is unemployed, and, given her background, experience, and health problems, it is highly unlikely that she will ever be able to earn sufficient income to support herself in the lifestyle the parties enjoyed during the marriage. This factor favors an award of permanent and substantial maintenance.

¶ 98 The third factor is the present and future earning capacity of each party. Based on her lack of education, training, or skills, as well as her significant health issues, Julie is unemployable or employable only at a very low wage, whereas Bernard's present and future earning capacity is excellent. Therefore, this factor favors an award of permanent and substantial maintenance.

¶ 99 The fourth factor is any impairment of the present and future earning capacity of the party seeking maintenance due to that party devoting time to domestic duties or having foregone or delayed education, training, employment, or career opportunities due to the marriage. The unrebutted testimony is that Julie's present and future earning

capacity has been substantially impaired due to her devoting time to domestic duties and having foregone education, training, employment, and career opportunities due to the marriage. The substantial impairment is partly because she assisted Bernard in building FSFG, which was awarded to Bernard. The parties agreed that she would be the primary caregiver after the birth of their sons instead of pursuing career opportunities. This factor weighs in favor of permanent and substantial maintenance.

¶ 100　The fifth factor is the time necessary to enable the party seeking maintenance to acquire appropriate education, training, and employment, and whether that party is able to support herself through appropriate employment. There is no indication that Julie is able to acquire appropriate education, training, or employment to support herself through appropriate employment. This factor weighs in favor of permanent and substantial maintenance.

¶ 101　The sixth factor is the standard of living established during the marriage. The trial court's observation that the parties' standard of living during the marriage was not lavish depends on how one defines lavish. To someone trying to live on Julie's maintenance award in this case, the parties' lifestyle during the marriage would, indeed, seem lavish. They enjoyed an 8,000-square-foot home on a golf course in a prestigious neighborhood. They took expensive vacations. They paid $2,000 per month for Blake's college tuition, car, and gas. They stayed, and entertained, at the Ritz Carlton. They had Rolex watches and other fine jewelry. The amount and duration of the maintenance award in this case would leave Julie in a situation where she could not come close to sustaining that lifestyle. This factor weighs in favor of a permanent and substantial maintenance award.

¶ 102  The seventh factor is the duration of the marriage.  The parties were married for almost 29 years.  They married when they were approximately 20 years old, and the marriage was dissolved when they were almost 50 years old.  During that time, Julie raised their sons and helped Bernard grow FSFG.  This factor weighs in favor of a permanent maintenance award.

¶ 103  The eighth factor is the age and the physical and emotional condition of both parties.  The parties are 50 years old.  This is not a good age for Julie to be entering the labor market, especially given her significant health issues.  She is undergoing counseling for depression and was hospitalized four or five times during the pendency of these proceedings for asthma and COPD.  This factor weighs in favor of a permanent maintenance award.

¶ 104  The ninth factor is the tax consequences of the property division upon the respective economic circumstances of the parties.  Based on the division of marital property in this case, Julie would have to sell assets to even purchase a home.  The assets she was awarded carry capital gain tax implications upon their sale or penalties upon early withdrawal, which would reduce the value of the property awarded to her.

¶ 105  The tenth factor is contributions and services by the party seeking maintenance to the education, training, career or career potential, or license of the other spouse.  This factor also weighs in favor of permanent and substantial maintenance.  Julie contributed to Bernard's education and career.  She worked while he continued his education, and she helped establish, maintain, and promote FSFG, which was awarded to Bernard.

¶ 106 The last two factors are any valid agreement of the parties and any other factor that the court expressly finds to be just and equitable. Those factors are not applicable.

¶ 107 After considering all of the relevant statutory factors, we conclude that the award of rehabilitative maintenance in the amount of $2,750 for 30 months was an abuse of discretion. Julie should have been awarded permanent maintenance in an amount sufficient for her to maintain the lifestyle the parties enjoyed during the marriage. The award of $2,750 per month is clearly insufficient under the facts in this case.

¶ 108 Our conclusions find support in the legislature's recent amendment of section 504 of the Act to provide a formula for determining the amount and duration of maintenance. See Pub. Act 98-961 (eff. Jan. 1, 2015) (amending 750 ILCS 5/504 (West 2012)). Although that provision is not applicable to this appeal, it does provide some guidance.

¶ 109 Section 504(b-1)(1)(B) provides that "[f]or a marriage of 20 or more years, the court, in its discretion, shall order either permanent maintenance or maintenance for a period equal to the length of the marriage." 750 ILCS 5/504(b-1)(1)(B) (West 2014). Therefore, if that provision were applicable, under the facts of this case, and pursuant to the guidelines, the court would be required to order either permanent maintenance or maintenance for a period of almost 29 years, which is in stark contrast to the 2½ years of maintenance awarded in this case.

¶ 110 In addition, applying the statutory guidelines to the parties' 2012 adjusted gross income ($216,078 for Bernard and $0 for Julie) would result in a monthly maintenance award of $5,401.95. See 750 ILCS 5/504(b-1)(1)(A) (West 2014) ("The amount of maintenance *** shall be calculated by taking 30% of the payor's gross income minus

32

20% of the payee's gross income."). If we assume that, pursuant to the trial court's property distribution, Julie would receive $6,000 per year from the oil lease and $7,118 per year from the rental properties, the monthly maintenance award would be reduced by $218.13 to $5,183.32, which is in stark contrast to the monthly maintenance award of $2,750 in this case.

¶ 111 We also note that our calculations do not take into consideration Bernard's 2013 income because it was not established at trial. However, his 2013 income was probably substantially more than his 2012 income because of the addition of the Indiana accounts. Moreover, we note that his 2011 adjusted gross income was $321,910 and that his reported 2012 adjusted gross income of $216,078 was artificially low because of an accounting entry whereby FSGS took a one-time $115,000 deduction for consulting fees that were part of the total purchase of the Indiana accounts.

¶ 112 We turn now to the issue of attorney fees. Section 508(a) of the Act provides, in pertinent part, that "[t]he court *** after considering the financial resources of the parties, may order any party to pay a reasonable amount for *** the other party's costs and attorney's fees." 750 ILCS 5/508(a) (West 2012). However, the spouse seeking the contribution must establish her inability to pay and the other spouse's ability to pay. *In re Marriage of Schneider*, 214 Ill. 2d 152, 174 (2005). A party has the financial inability to pay attorney fees if the payment of the fees would strip her of her means of support or undermine her financial stability. *Id.* In making an award pursuant to a party's petition for contribution to attorney fees and costs, the court must base the award on the criteria for the division of marital property as set forth in section 503(d) of the Act (750 ILCS

33

5/503(d) (West 2012)) and, if maintenance has been awarded, the criteria for an award of maintenance set forth in section 504(a) of the Act (750 ILCS 5/504(a) (West 2012)). 750 ILCS 5/503(j)(2) (West 2012). Each of these provisions requires the court to consider the property awarded to each party. 750 ILCS 5/503(d)(3), 504(a)(1) (West 2012). As the ultimate distribution of the marital property affects the determination of whether attorney fees should be awarded, the trial court's determination regarding attorney fees is also reversed and the cause is remanded for a new trial on that issue as well.

¶ 113 However, because the issue is likely to recur on remand, we will briefly address Julie's argument that the failure to award her her attorney fees was an abuse of discretion. In denying Julie's request for attorney fees, the trial court made the following findings:

"First, an hourly rate of $450 is excessive and is not the usual and customary charge in the community. Second, this was not a novel or complex case. The most complex issue was the valuation of [FSFG], which was done by the expert witnesses, not the attorneys. Third, the conduct of Julie's attorney during these proceedings did not result in a benefit to her. Fourth, this court finds that Julie's attorney engaged in harassment, unnecessary delay and other acts which needlessly increased the cost of litigation ***. *** With respect to the overall representation of her client in this case, this court will simply note that zealous advocacy is one thing, this was something else entirely."

¶ 114 The trial court abused its discretion in denying Julie's request for attorney fees because it failed to consider all of the relevant statutory factors and, instead, based its decision on its disapproval of her attorney's conduct. Therefore, after the distribution of

34

marital property on remand, the trial court is to consider all of the relevant statutory factors in deciding whether to award Julie her attorney fees.

¶ 115                                CONCLUSION

¶ 116  For the foregoing reasons, we reverse the judgment of the circuit court of Marion County and remand for a new trial on the issues of the valuation and distribution of marital property, the amount of permanent maintenance to be awarded to Julie, and whether she should be awarded her attorney fees.


¶ 117  Reversed and remanded.

2016 IL App (5th) 140479

NO. 5-14-0479

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| | ) | Circuit Court of |
| BERNARD R. JOHNSON, | ) | Marion County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| and | ) | No. 11-D-214 |
| | ) | |
| JULIE B. JOHNSON, | ) | Honorable |
| | ) | Michael D. McHaney, |
| Respondent-Appellant. | ) | Judge, presiding. |

_____

**Rule 23 Order Filed:**     December 2, 2015
**Motion to Publish Granted:**     January 7, 2016
**Opinion Filed:**     January 7, 2016

_____

**Justices:**     Honorable Bruce D. Stewart, J.

      Honorable Thomas M. Welch, J., and
      Honorable Melissa A. Chapman, J.,
      Concur

_____

**Attorney**     Larry L. LeFevre, LeFevre, Oldfield, Myers, Apke & Payne Law Group,
**for**     Ltd., 303 South Seventh, Box 399, Vandalia, IL 62471
**Appellant**

_____

**Attorney**     Aaron S. Carnine, Black, Hedin, Ballard, McDonald, P.C., P.O. Box 4007,
**for**     108 S. Ninth Street, Mt. Vernon, IL 62864
**Appellee**

_____