*In re* MARRIAGE OF BARBARA GRUNSTEN, Petitioner-Appellant, and RICHARD GRUNSTEN, Respondent-Appellee.

First District (6th Division)    No. 1—95—3583

Opinion filed February 11, 1999.—Modified on denial of rehearing April 30, 1999.

Joel Ostrow, of Chicago, for appellant.

Sloan & Associates, of Chicago (Mel Sloan and Bradley J. Plaschke, of counsel), for appellee.

JUSTICE ZWICK delivered the opinion of the court:

The petitioner, Barbara Grunsten, appeals from the judgment of dissolution of her marriage to the respondent, Richard Grunsten, challenging the trial court's distribution of marital assets, its award of maintenance and its findings regarding the payment of attorney fees.

A substantial amount of evidence and testimony was presented in the trial court over 11 days between August 11, 1994, and October 24, 1994. However, only those facts necessary to an understanding of this court's decision will be set forth. The relevant facts will be discussed in the analysis of the issues to which they are pertinent.

I. Valuation of GSP Marketing Services, Inc.

Richard is the sole shareholder of an Illinois corporation, GSP Marketing Services, Inc. (GSP). GSP designs and produces mail order catalogs and performs other marketing services. The business was founded in 1979, and it is conceded to be marital property. The parties stipulated that GSP should be valued as of December 31, 1993. Each party retained accountants as expert witnesses for this purpose.

The trial court noted that similar approaches were taken by each accountant in valuing GSP. Both witnesses based their valuations on capitalizing the average earnings over a four- or five-year period weighted in favor of more recent years and discounted due to the lack of marketability of closely held corporations. However, each used a different valuation method in reaching his final conclusion. Barbara's accountant valued GSP's shares using various economic assumptions and concluded the shares had a fair market value of $1,043,771. Richard's accountant valued Richard's shares as being worth $418,954.

As explained in the trial court's memorandum opinion and order, Barbara's accountant used an "excess earnings" or "formula" method. This method assumes that the principal officers of closely held corporations take advantage of their ability to set their own compensation to minimize taxes by drawing out unneeded corporate profits in the form of salary and bonuses—rather than as dividends—in order to avoid the double taxation that occurs when corporations make a profit.[1] Such compensation necessarily exceeds a lower level of compensation that could be paid to a nonowner hired to perform the same job. To compensate for this tax-avoidance practice, the excess payments are adjusted back into the corporation's history in estimating what its future profits are likely to be.

---

[1]Double taxation occurs because the corporation must pay corporate income tax on its profits, and because shareholders must subsequently pay personal income tax on any dividends declared by the corporation. If corporate earnings that would otherwise represent profit to the corporation are diverted instead to an executive officer/shareholder in the form of salary, no corporate taxes are assessed with regard to the diverted payments, and so only personal income tax is collected. See generally D. Ackerman & T. Kinasz, *Tax Considerations in Organizing Closely Held Corporations*, in *Closely Held Corporations* § 2.5 (Ill. Inst. for Cont. Legal Educ. 1996).

Barbara's accountant determined Richard's "normal" compensation by referencing a salary survey of chief executive officers of small businesses conducted by the Research Institute of America. For example, he found that Richard's 1993 salary was $282,463, of which $182,500 was "normal" and $99,963 was "excess." A weighted average of this adjusted annual compensation was then capitalized to determine the corporation's "goodwill."

The value of GSP according to Barbara's expert's method is expressed by the following formula: Value = current (1993) net tangible assets + goodwill — discount for lack of marketability. The final estimate of $1,043,771 was derived by averaging various rates of return on net tangible assets and capitalization rates.

In addition to the above analysis, Barbara's expert noted that GSP had originally been started with a shareholder named Bob Simonek. Simonek owned 50% of GSP's outstanding shares when he died in 1987 or 1988. On April 8, 1989, Richard entered into a written agreement with Simonek's widow in which he bought Simonek's shares for a cash payment of $245,246. In addition, Simonek's widow served as a consultant to GSP for a period of three years following Simonek's death at an annual salary of $45,833.34 per year. However, she was not at work very often in those three years and Richard could only recall her working on 1 of 40 GSP accounts. The buyout also included furnishing $25,000 over 10 years to establish an insured college scholarship for Mr. Simonek's daughter.[2]

In the fiscal year of Simonek's death, gross sales of GSP had been $6,204,909. By 1992, they had risen to $9,006,809. Given the increasing strength of GSP's financial position since the time of the Simonek sale, Barbara's expert stated that whatever value was placed on GSP, the terms of the Simonek stock purchase set a baseline for what 50% of the company was currently worth.

The report of Richard's accountant, who had a preexisting relationship with both Richard and GSP, was based upon the "capitalization of earnings" method. This method assumes that various types of business investments entail different levels of risk. The risk is expressed in terms of a risk factor multiple ranging from one to four with no risk being given a value of one and the highest risk receiving a value of four. The benchmark for measuring risk is the interest rate

---

[2]Barbara argues on appeal that, in addition, Mrs. Simonek had an $80,000 debt to the corporation forgiven as part of the compensation she received for her shares. However, a close reading of the record shows that Richard disputed this, testifying that the cash payment of $245,246 was calculated after taking the debt into account.

on 30-year government bonds, being 6.35% at the time of valuation. The capitalization rate is determined by multiplying the risk factor by the benchmark rate. Thus, the capitalization rate for a high risk business on December 31, 1993, is $4 \times 6.35 = 25.4$. The value of a high risk business on December 31, 1993, can then be expressed as follows: Value = 100 divided by 25.4 = 3.93 x weighted average of net annual corporate earnings — discount for lack of marketability.

Richard's accountant opined that GSP was a high risk business, principally because its value was closely tied to Richard's personal expertise and his relationships with clients. He also noted that GSP had a small customer base and that 60% of its sales were accounted for by only five clients. He computed GSP's weighted average annual net income to be $152,021, and he employed a 30% discount for lack of marketability. His computation of GSP's value was then expressed as follows: Value = 3.93 x $152,021 = $598,506[3] x .70 = $418,954.

The trial court found that both accountants had been "flawed" in their analyses. The court stated that the assumptions of Barbara's accountant regarding "normal" and "excess" officer compensation to have been "wholly arbitrary." The court was also critical of Barbara's accountant's methodology in that he only "looked up numbers in a study whose parameters were not described, and the numbers were not specific either for the industry or geographic location." Indeed, the court specifically found that Richard's salary had not been inflated to avoid federal taxes. It noted that Richard was actively involved with all 40 of GSP's active clients and that he personally managed the five largest client accounts. The court also observed that GSP's chief salesman, Michael Zaremba, was paid over $400,000 in 1993, while Richard received only $282,463 that year. The court found Richard's expert to have used a proper methodology in calculating GSP's value, but determined that Richard's expert had overstated the riskiness of GSP's business. Rather than being a high risk business, the trial court stated that GSP should be considered as "moderately risky." In applying the correct risk factor to Richard's expert's formula, the trial court determined that GSP had a fair market value on December 31, 1993 of $558,677.

■ ■ Section 503(c) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/503(c) (West 1996)) requires that the court shall divide marital property in "just proportions." To apportion

---

[3]In fact, $3.93 \times \$152,021 = \$597,443$. When this correct figure is multiplied by .70, a final valuation for GSP is calculated to be $418,210, not $418,954. The error appears in the trial court's memorandum and opinion but, as explained immediately below, did not affect the court's final valuation of GSP.

marital assets under section 503(c), the value of such assets must first be established. *In re Marriage of Melnick*, 127 Ill. App. 3d 102, 468 N.E.2d 490 (1984). Testimony concerning the valuation of assets in an action for dissolution of marriage is a matter to be resolved by the trier of fact, and as long as the court's valuation is within the range testified to by the expert witnesses, it ordinarily will not be disturbed on appeal unless it is against the manifest weight of the evidence. *In re Marriage of Wilder*, 122 Ill. App. 3d 338, 349, 461 N.E.2d 447 (1983). As the trial court noted, determining market value for a closely held business is not unlike the evaluation process that must be applied in valuing professional corporations. The process is inherently subjective:

> "Placing a fair market value on the professional corporation is an art, not a science, and the court must rely on expert witnesses to assist it in this difficult task. There is no exact formula that can be applied, so the trial court must rely on experts who may differ significantly in both methodology and valuation. The trial court must consider the relevant evidence before it; determine the credibility of the experts, the reasonableness of their testimony, the weight given to each of them, and their expertise in the particular area of valuation; and then determine fair market value." *In re Marriage of Gunn*, 233 Ill. App. 3d 165, 183, 598 N.E.2d 1013 (1992).

On appeal Barbara argues, *inter alia*, that the trial court's valuation of GSP is against the manifest weight of the evidence because it is below the valuation Richard paid to Simonek's widow four years earlier, and because the evidence establishes that GSP's financial health had greatly improved since the earlier transaction. Barbara argues, as her expert did below, that the Simonek transaction should necessarily set the "floor value" for GSP. We agree.

■ Although valuation of a closely held corporation is subjective in nature, the process is obviously much less so when done with the benefit of viewing a similar transaction, particularly when the comparison transaction involves the same property. This is because fair value is best measured by what a willing buyer would pay a willing seller in a voluntary transaction. See *In re Parker*, 216 Ill. App. 3d 672, 575 N.E.2d 938 (1991). Here, on reviewing the record, we conclude that the trial court failed to give the Simonek sale sufficient consideration in assessing the value of GSP. Had the court done so, it would have been evident that Richard's expert's valuation was grossly inaccurate.

In our view, GSP cannot be reasonably valued at less than twice the value Richard gave Mrs. Simonek. Yet the trial court's valuation of $558,677 is clearly far below this threshold amount. The present value of the Simonek transaction can be logically calculated by adding the

cash payment made to Mrs. Simonek ($245,246), the cash value of the $25,000 tuition payments, and any unearned salary Mrs. Simonek received in the transaction, and then adjusting this sum to account for the growth of GSP since the sale. In light of Mrs. Simonek's apparent lack of any articulable consulting skills and Richard's own concession that she was not at GSP very often during the three years she was paid as a consultant, it is clear that the salary payments made to Mrs. Simonek must be treated in large measure as consideration for the sale.

If extremely conservative estimates are applied to the unearned salary and scholarship payments and they are valued at 50% of their nominal cost to Richard, the total amount of consideration received by Mrs. Simonek for her shares is $245,246 (cash) + $68,750 ($1/2$ of the "salary payments") + $12,500 ($1/2$ of the scholarship payments) = $326,496. This means the corporation had an estimated worth, in 1989, of twice this amount, or $652,992. Although profitability figures were in dispute at trial, it was conceded that GSP's gross revenues grew between 1989 and 1993 by more than 50%. If the corporation's fair market value is then calculated assuming its gross revenues roughly corresponded with its profitability to account for its financial growth, once again conservatively discounting the suggested nominal value by half, it is evident that GSP cannot be reasonably valued at less than $652,992 x 1.25 or $816,240.

We have carefully reviewed the record with regard to the court's valuation of GSP. Following our review, we conclude that a most conservative valuation of GSP suggested by the record, taking into account the experts' valuations, the Simonek transaction and the company's sustained growth since 1989, cannot be reasonably set below $816,240. This figure is not only supported by the financial evidence but also within the range of values suggested by the experts. Accordingly, we set GSP's value at this amount. We make this specific finding rather than remand the case for further proceedings in light of the voluminous record before us, which shows that the parties have litigated their dispute to the point where further proceedings could never be construed as serving the ends of justice. See generally 155 Ill. 2d R. 366(a).

## II. Barbara's Permanent Maintenance

Barbara is a 52-year-old woman with a college degree in fine arts. At the time of the dissolution, she had been married to Richard for more than 21 years. From the time of her graduation in 1964 until July of 1990, she was employed in the photography and modeling fields. She has worked as a photography stylist and as a booking sub-

agent for models. Her salary when she left her last employment in 1990 was $22,000. Richard, in extreme contrast, earned an annual salary at the time of the dissolution of over $275,000 per year. As the trial court recognized in its order and memorandum, his income had provided them both with a "luxurious" lifestyle.

Barbara offered an affidavit showing her monthly expenses to be $11,664. The trial court rejected the affidavit, calling it "the Paul Bunyan of all income and expense affidavits." The affidavit does not appear to have been included in the record on appeal. However, the trial court noted that it simultaneously listed a $2,000 mortgage payment on an unbought home and $1,000 for unmade repairs to Barbara's present home. It also requested $450 for a professional dog walker to escort her pet to dog shows. The court found that the affidavit "represented the lifestyle of the divorce, not the marriage." Accordingly, the court disregarded the affidavit and looked instead to an affidavit Barbara had filed five months after the dissolution proceedings had been instituted, finding it to be a better indication of Barbara's "reasonable needs." The affidavit sought temporary support of $4,800 per month.

■ Section 504(a) of the Act (750 ILCS 5/504(a) (West 1996)) provides a court may grant permanent or temporary maintenance upon consideration of "all relevant factors," including:

"(1) the income and property of each party, including marital property apportioned and non-marital property assigned to the party seeking maintenance;

(2) the needs of each party;

(3) the present and future earning capacity of each party;

(4) any impairment of the present and future earning capacity of the party seeking maintenance due to that party devoting time to domestic duties or having foregone or delayed education, training, employment, or career opportunities due to the marriage;

(5) the time necessary to enable the party seeking maintenance to acquire appropriate education, training, and employment, and whether that party is able to support himself or herself through appropriate employment or is the custodian of a child making it appropriate that the custodian not seek employment;

(6) the standard of living established during the marriage;

(7) the duration of the marriage;

(8) the age and the physical and emotional condition of both parties;

(9) the tax consequences of the property division upon the respective economic circumstances of the parties;

(10) contributions and services by the party seeking maintenance to the education, training, career or career potential, or license of the other spouse;

(11) any valid agreement of the parties; and

(12) any other factor that the court expressly finds to be just and equitable."

An award of maintenance is within the discretion of the trial court and will not be reversed on appeal unless it constitutes an abuse of discretion or is against the manifest weight of the evidence. *In re Marriage of Hensley*, 210 Ill. App. 3d 1043, 1048, 569 N.E.2d 1097 (1991); *In re Marriage of Hart*, 194 Ill. App. 3d 839, 851, 551 N.E.2d 737 (1990). An abuse of discretion occurs where no reasonable person would take the view adopted by the trial court. *In re Marriage of Cheger*, 213 Ill. App. 3d 371, 378, 571 N.E.2d 1135 (1991).

■ Here, the trial court, in dividing the parties' assets, awarded Barbara very little income-producing property, yet awarded her only $1,538 in monthly permanent maintenance to sustain a lifestyle which the court's own assessment would cost her approximately $4,800 per month. Although an award of marital property is correctly considered by the trial court in setting maintenance under section 504(a), the law is clear that a spouse is not required to sell assets for self-support where the other spouse has the financial ability to pay sufficient maintenance while meeting his own needs. See *In re Marriage of Tietz*, 238 Ill. App. 3d 965, 972, 605 N.E.2d 670 (1992); *In re Marriage of Pearson*, 236 Ill. App. 3d 337, 350, 603 N.E.2d 720 (1992). The paucity of the court's maintenance award in this case is evident when it is recognized that Barbara's monthly maintenance was set at less than *half* the amount Richard claimed at one point he needed for clothing and entertainment. Moreover, the court, by basing its determination of Barbara's reasonable needs on her initial affidavit, necessarily failed to take into consideration several of Barbara's long-term expenses, such as real estate taxes, health insurance and home repairs. Insomuch as these were all part of the standard of living of the marriage, the record establishes that the court underestimated Barbara's reasonable needs.

The record also demonstrates that the court unreasonably discounted Barbara's likely long-term health care expenses and overestimated her ability to earn salary income. The court stated that it believed Barbara's physician to be "the most pathetic witness" it had ever seen, yet Richard never disputed that Barbara had been treated for depression during the course of their marriage and that, at one point prior to the start of the dissolution proceedings, Barbara was incurring as much as $800 per month in psychiatric costs. Apparently based upon its negative view of Barbara's expert witness, the court concluded that Barbara was "in good health" and that her reasonable medical expenses should be no more than $300 per month.

However, the evidence presented by Barbara as to the reasonable cost of her psychiatric care was not disputed by expert testimony from Richard. Although a trial judge may be free to disregard psychiatric testimony, he may not do so based upon his own prejudices where the testimony offered of psychiatric illness has substantial foundation. *In re Violetta B.*, 210 Ill. App. 3d 521, 535, 568 N.E.2d 1345 (1991).

The factual foundation presented in this case is that Barbara had been treated by her physician for 12 years during the course of the marriage and that she was being treated for depression at the time of the proceedings. She testified that she suffers frequent crying spells, sleep loss, memory loss, continual feelings of anxiety and an inability to cope with stress. In addition to her depression, her treating physician testified that if she returned to her previous line of work, it could be "very damaging" to her self-esteem. Despite this testimony, and despite the court's finding that Barbara was entitled to continue to live the "luxurious" lifestyle of the marriage, the trial court stated that it did not "see why she couldn't go back to [the modeling industry] at $22,000 per year."

Under these facts, the trial court's finding that Barbara was "healthy" and had a future as an employee in the modeling industry was against the manifest weight of the evidence. In addition, the court's finding that Barbara was likely to incur monthly medical expenses of only $300 per month was against the manifest weight of the evidence.

In light of the factors set out in section 504(a) and the court's finding that Barbara's reasonable needs shortly after the dissolution were $4,800 per month, we set her permanent maintenance at this level. We do so recognizing that certain long-term costs may have been omitted from her initial affidavit on which the court based the $4,800 amount, but conclude that $4,800 is the only value supported by the record before us and that any additional costs that have been omitted are not likely to be so onerous to Barbara as to require further adjustment. Moreover, we note that the trial court made the amount of Barbara's permanent maintenance subject to periodic future review.

III. Attorney Fees

The record shows that Barbara filed a petition for fees and costs on April 23, 1995, seeking imposition of those expenses against Richard. Richard responded by filing a motion for summary judgment, stating that Barbara had sufficient assets to pay her own fees and that her statement at trial that her fees had been $40,000 was *res judicata* precluding her claim of legal fees totalling $134,000.

Barbara responded by filing her own motion for summary judg-

ment, stating that her monthly payments under the judgment were her only income as compared to Richard's $275,000 salary, that he had a far superior asset position and that *res judicata* on the extent of her legal fees was inapplicable because the fees discussed at trial had been those that had been paid as of that time, not those that had been earned.

Respective counsel appeared before the court on August 28, 1997. The court stated that it did not believe the fee issue was amenable to summary judgment since Barbara's property distribution did not contemplate her paying her own fees. At that time the fee petition was for a total of $137,534.75, of which $63,652.87 had been paid. The court also stated, however, that it simply did not believe Barbara had an inability to pay, partly evidenced by what she had already paid, and supported by its view that she could be working and using her salary income to pay legal fees. The court also stated that Barbara could get a home equity loan on her residence. The court then denied Barbara's request for a hearing on the parties' financial circumstances and entered an order denying assessment of any of Barbara's fees against Richard.

■ On appeal Barbara argues that it was error to enter an order disposing of the fee issue without holding a hearing. We agree. In *In re Marriage of Cierny*, 187 Ill. App. 3d 334, 543 N.E.2d 201 (1989), the court held that the right to a hearing on the financial ability to pay attorney fees exists, if requested, and is only waived if no such request is made. Here, Barbara repeatedly requested a hearing once the trial court stated its view that the fee issue was not amenable to summary judgment. This is despite the fact that Barbara's maintenance had been set by the court at 32% of what the court determined were her reasonable needs.

In sum, after finding the trial court's valuation of GSP and monthly maintenance to Barbara to be so low as to be against the manifest weight of the evidence, we find the record supports a fair market valuation of GSP at $816,240. In addition, we find the record requires a permanent monthly maintenance award to Barbara of at least $4,800. On remand, we direct the court to enter an order adjusting its memorandum and order as to make it consistent with these findings, as well as to hold a hearing on the attorney fees issue.

For the foregoing reasons, the judgment of the circuit court of Cook County is reversed and the case is remanded for further proceedings consistent with this opinion.

Reversed and remanded.

BUCKLEY and QUINN, JJ., concur.