2020 IL App (2d) 200068-U
No. 2-20-0068
Order filed December 29, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* Marriage of JENNIFER JOHNSON MORRISON, | ) ) ) | Appeal from the Circuit Court of Du Page County. |
| Petitioner-Appellee, | ) ) | |
| and | ) | No. 12-D-2312 |
| | ) | |
| JAMES P. MORRISON, | ) ) | Honorable Linda Davenport, |
| Respondent-Appellant. | ) | Judge, Presiding. |

JUSTICE HUDSON delivered the judgment of the court.
Justices McLaren and Brennan concurred in the judgment.

**ORDER**

¶ 1     *Held*:   Trial court did not err in finding respondent in indirect civil contempt for failing to make reasonable attempts to comply with marital settlement agreement; finding of indirect civil contempt was proper on the issue of whether or not respondent had produced all documents required by marital settlement agreement; but finding of indirect civil contempt for failing to produce documents pertaining to certain stock was error where order contained no purge provision pertaining to said documents.

¶ 2                                    I. INTRODUCTION

¶ 3     Respondent, James P. Morrison, appeals an order of the circuit court of Du Page County finding him in indirect civil contempt stemming from his alleged noncompliance with a marital-settlement agreement (MSA). The order required respondent to transfer shares of stock of Best In

Class Care, Inc., (BICC), to petitioner, Jennifer Johnson Morrison, or, alternatively to pay her $175,000. It also required respondent to turn over certain documents to petitioner. For the reasons that follow, we affirm in part, reverse in part, and remand.

¶ 4                                    II. BACKGROUND

¶ 5     The parties were married in June 1996, and divorce proceedings were commenced by petitioner in November 2012. One child was born of the marriage in 2003. The parties exercise joint custody over the minor. A dissolution judgment was entered on May 5, 2016. The judgment incorporated the parties' MSA.

¶ 6     Pertinent here, the judgment provided:

"8. Business Interest—POLARIS SOLUTIONS, LLC

a) The parties acknowledge that during the course of their marriage, JAMES established POLARIS SOLUTIONS, LLC, an Illinois Limited Liability Company ('Polaris'), and acquired a fifty percent (50%) ownership interest in Polaris. JAMES shall retain his fifty percent (50%) interest in Polaris free of any claim of JENNIFER.

b) JENNIFER assigns and transfers all right, title and interest in and to Polaris to JAMES.

c) JAMES shall identify and hold harmless JENNIFER from any liability related to Polaris.

**9. Best In Class Care, Inc. Stock**

a) Polaris presently owns 157,184.875 shares of stock (hereinafter referred to as 'stock rights') in Best In Class Care, Inc., a Delaware Corporation ('BICC'). Per JAMES' 50% interest in Polaris, he has ownership of 50% of the Polaris holdings

in BICC. Due to restrictions on the BICC stock rights and the nature of the agreement between Polaris and BICC, there are only limited periods where BICC stock may be liquidated. JAMES' interest in Polaris' stock rights (78,574.4375 shares) shall be divided in kind, subject to the restrictions, on a 50/50 basis when they become exercisable, subject to the following paragraphs:

i) If possible, JAMES shall transfer to JENNIFER her share of the stock rights within thirty (30) days from entry of this Agreement. If the stock rights are not transferable, then JENNIFER shall have the right to require JAMES to exercise the stock rights in a quantity and amount up to the portion to which she is entitled as set forth herein if, as, and when a stock right becomes exercisable. Upon written request by JENNIFER or upon the occurrence of an event which requires the sale of the rights, JAMES shall exercise JENNIFER's stock rights in a quantity and amount as directed by her or the corporation, provided JAMES is not restricted from exercising a stock right at that particular time period. In the event that JAMES is restricted from exercising a stock right at the time of the request, JAMES shall exercise the stock right immediately upon the restriction being removed.

ii) If the stock is not transferred to JENNIFER then the net proceeds of the exercise and sale of JENNIFER's stock rights shall be immediately turned over to JENNIFER upon JAMES's receipt. For purposes of this subparagraph, 'net proceeds' shall be defined as the difference between the sales price and basis, less costs/commissions of sale and JAMES's appropriately calculated income taxes, if any."

Pursuant to the MSA, respondent was to pay petitioner $3,000 per month for child support. The MSA further established how additional child support should be calculated should respondent earn in excess of $270,000.

¶ 7    On October 31, 2016, petitioner filed a motion to compel respondent to transfer to her or sell the shares of BICC stock that were due her in accordance with the MSA. The motion alleged that on July 8, 2016, respondent sent petitioner an email stating that he was unable to transfer the BICC shares prior to a public offering. It further alleged that the email did not address whether respondent could sell the stock or set forth what efforts he made to comply with the MSA. On September 15, 2016, petitioner requested that respondent explain what efforts he had made to transfer the stock; respondent did not reply. Moreover, petitioner alleged, respondent had provided her with no records or documents concerning the stock since entry of the judgment of dissolution of marriage.

¶ 8    Replying to the motion, respondent stated that the stock could not currently be transferred and that this fact was known to petitioner and her attorney at the time the parties entered into the MSA. It further alleged that respondent is a "non-controlling" member of Polaris and that Polaris owns restricted stock in BICC. The BICC shareholder agreement restricts the ability to transfer stock prior to a public offering. A stockholder could request to transfer the stock; however, other shareholders would have a right of first refusal to acquire the shares on the terms they were being transferred. Because a transfer from respondent to petitioner would involve no consideration, other shareholders could exercise their right of first refusal and essentially acquire the shares for free. Respondent further alleged that respondent and her counsel have been in possession of the BICC shareholder agreement since before the entry of the judgment of dissolution. The response also alleges that the Polaris operating agreement provides that all members must consent to the transfer

of Polaris's assets to a third party. Polaris is owned by respondent and Christopher Kadel. Thus, even if the stock were transferable in accordance with the BICC shareholder agreement, it would still be necessary for Kadel to consent to the transfer. The response alleges that "for many clearly legitimate reasons, Mr. Kadel will not agree to the transfer or sale of Polaris'[s] Best In Class stock." Kadel authored a letter stating that it would be unduly complicated to equitably share any potential gains and tax liabilities. Further, a transfer would weaken Polaris's balance sheet, which needed to be improved, and impair the company's ability to acquire future debt.

¶ 9        On December 3, 2018, the trial court ordered respondent to provide petitioner with updated documents. Respondent complied on January 3, 2019. On January 7, 2019, petitioner filed a three-count petition for a rule to show cause. The first count was based on respondent's alleged failure to provide documents related to BICC within three days in accordance with the judgment for dissolution. The second alleged that respondent had failed to transfer shares of BICC to petitioner despite having contemplated transferring such stock to a new company. Additionally, petitioner alleged that her attorney had communicated with BICC's president, who stated that it was possible to transfer BICC stock to petitioner. The final count asserted that respondent failed to provide petitioner with documentation concerning income he received for selling four percent of his membership interest in Polaris.

¶ 10        Respondent's response to the petition alleged that he and Kadel contemplated creating an affiliated entity to hold BICC stock, while the sale of four percent of respondent's membership interest in Polaris was taking place in order to segregate the BICC stock from the transfer. In fact, according to respondent, this transfer never actually took place. Further, respondent asserted that he could not transfer shares to petitioner as she was not a "related party," by which he meant a current shareholder of BICC stock. He also denied that he was required to pay additional child

support based on the sale of a portion of his membership interest in Polaris, as that was a capital asset he had been awarded by the dissolution judgment and his conversion of it to cash did not constitute income.

¶ 11    Respondent pointed out that the Polaris operating agreement defines him and Kadel as managers. Unanimous consent is required for any expenditure exceeding $20,000, and no member of Polaris has a right to demand "any distribution in a form other than cash." The BICC shareholder agreement limits how shares may be transferred. Section 3.3 of the shareholder agreement allows the transfer of shares to a "permitted transferee." Section 3.5 restricts public transfers. Section 4 establishes the right of first refusal, and section 4.10 renders noncomplying transfers *void ab initio*.

¶ 12    Respondent also points to the "Membership Interest Purchase Agreement" entered into by him and Kadel on September 30, 2017. In it, they agreed to transfer a four percent membership interest from respondent to Kadel for $166,000. They amended the operating agreement so that respondent's entitlements to salary, bonus, and benefits remained the same as Kadel's interest. Also, section 4.4 of the agreement states:

> "The Company, through its services, has acquired 171,298.75 shares of stock in Best in Class Care, Inc, a Delaware corporation, and a warrant to purchase a membership interest in Alpine Energy Systems, LLC, an Illinois limited liability company. Effective as of the Closing Date of this Agreement, the Best in Class Care, Inc stock and the Alpine Energy Systems, LLC warrant will be transferred to a new Illinois company structured with Purchaser and Seller each owning 50% of the new LLC."

¶ 13    A trial was held on petitioner's petition for rule to show cause and motion to compel the transfer of BICC stock beginning on February 27, 2019. The trial court bifurcated the testimony, first addressing the rule to show cause for failing to transfer the BICC stock, next addressing

petitioner's motion to compel transfer of the stock, then addressing respondent's alleged failure to tender documents pertaining to BICC in a timely manner, and finally addressing his failure to disclose the money he received from selling four percent of Polaris to Kadel.

¶ 14    Respondent was first called by petitioner. Respondent acknowledged that he never made a request in writing to transfer any BICC stock. Respondent identified the "Membership Interest Purchase Agreement," which he signed on September 30, 2017. Respondent testified that he "believe[d]" that he provided this document to petitioner "a few months ago" and agreed that the document was stamped January 3, 2019. Respondent received $166,000 for selling a portion of his share of Polaris to Kadel. Respondent did not pay child support on this money because he felt this was the sale of a capital asset rather than income. Respondent acknowledged that at about the same time as this sale was executed, his salary had been reduced substantially. However, his income and Kadel's were "exactly the same."

¶ 15    Respondent read section 4.4 of the Membership Interest Purchase Agreement, which concerned transferring BICC stock to a new company. Respondent agreed that he and Kadel had decided that they could transfer BICC stock out of Polaris. Prior to January 3, 2019, respondent never provided petitioner with a copy of the agreement.

¶ 16    Based on this testimony, the trial court found that a rule should issue based on respondent's failure to use his best efforts to effectuate a transfer of stock to petitioner. Accordingly, the burden shifted to respondent to show why he should not be held in indirect civil contempt.

¶ 17    Respondent then testified in his own behalf. He acknowledged that the MSA required him to transfer to petitioner her share of the BICC stock. On the date of the judgment of dissolution of marriage, the BICC stock was actually owned by Polaris. Polaris was owned by respondent and Kadel. Respondent owns no BICC shares personally. Respondent does not have the ability to

transfer shares he does not own. To be able to transfer shares from Polaris, a majority vote of owners was required. This effectively meant he could not transfer the BICC stock without Kadel's permission.

¶ 18    Moreover, the agreement between Polaris and BICC limited periods in which Polaris could liquidate stock. BICC stock could only be transferred among affiliated members, and petitioner was not an affiliated member but Kadel was. This document was tendered to petitioner during the course of the earlier litigation. The document remained in effect at the time of the trial. Respondent also noted that the document provides a right of first refusal for the company and other shareholders in the event a shareholder attempted to transfer stock.

¶ 19    In May 2016, respondent approached Kadel about transferring BICC stock to petitioner. On July 8, 2016, respondent testified, he informed petitioner via email that he lacked the ability to transfer the BICC stock. Respondent estimated he made four requests of Kadel to be able to transfer the BICC stock; however, none of them were in writing.

¶ 20    Though they contemplated transferring the BICC stock to a new company, they never actually did so. He explained that since both he and Kadel were affiliates, they could have transferred the stock to another company equally owned by both of them. The purpose of the transfer was to allow respondent to maintain a 50% interest in the BICC stock when he transferred a portion of his interest in Polaris to Kadel. Outside of warrants to purchase stock in another company, BICC is the only company in which Polaris owns an interest.

¶ 21    On cross-examination, by petitioner's counsel, respondent testified that as affiliates, he and Kadel could transfer shares between themselves. Respondent stated he was not familiar with a provision in BICC's "Equity Incentive Plan" that allowed for the transfer of shares in connection with a domestic relations order (DRO). Respondent objected to admission of the Equity Incentive

Plan, citing relevance, because it did not pertain to BICC stock and concerned an employee stock incentive plan.

¶ 22    Respondent agreed that the email he sent petitioner on July 8, 2016, informing petitioner that he could not transfer the BICC stock to her includes a reference to a conversation he had with the attorneys that represented him at the time of the entry of the MSA. However, he denied that at the time he signed the MSA, he had no intention of transferring the stock. When asked what he did to attempt to effectuate a transfer, respondent stated that he reviewed the relevant documents and spoke with Kadel. Respondent added, "Those two items seemed clear and straightforward that it was—it was not possible."

¶ 23    Polaris acquired the BICC stock as compensation for performing IT services for BICC. Respondent identified the agreement between Polaris and BICC establishing that relationship. Under the agreement, Polaris is defined as a "key holder" of BICC stock. Polaris did not pay BICC anything when it received the shares.

¶ 24    On redirect-examination, respondent stated that he had communicated to petitioner that the BICC stock was not transferrable *to her*, he never told her that it could not be transferred to anyone under any circumstances. Documents regarding BICC stock were tendered to petitioner prior to the entry of the dissolution judgment. During examination by the trial court, respondent testified that he never made a request in writing to Polaris regarding taking the steps necessary to transfer the BICC stock to petitioner. He stated that he did so orally, and Kadel did reply in writing stating his opposition to doing so. Respondent added that without Kadel's consent, respondent did not have the legal right to make a request in writing on behalf of Polaris to BICC. If Kadel had agreed to the transfer of BICC stock to petitioner, the next step would have been to approach BICC and comply with the procedures in BICC's operating agreement.

¶ 25    Respondent next called Christopher Kadel. Kadel testified that he is the CEO of Polaris, and respondent is his partner. Polaris owns stock in BICC. There are restrictions in how this stock may be transferred to non-affiliated persons. Kadel and respondent do not own any BICC stock individually. Respondent could request a distribution of shares of BICC stock owned by Polaris. However, Kadel would be required to take a *pro rata* distribution if respondent's request were granted. In November 2016, Kadel sent a letter to respondent expressing his disapproval of transferring BICC shares from Polaris to a third party. He stated that this was in response to an inquiry sent by respondent via email. He had previously expressed his disapproval informally. Kadel disapproved because of the harm such a transfer would cause to Polaris, its employees, and Kadel personally. Polaris has 31 employees. Since November 2016, respondent has approached Kadel repeatedly about transferring shares of BICC stock. These were typically oral conversations.

¶ 26    Kadel agreed that he purchased a four-percent interest in Polaris from respondent. Polaris has never transferred any BICC stock to any other entity. Polaris continues to own all of the BICC stock it had previously owned.

¶ 27    On cross-examination, Kadel stated that he did not have with him a copy of the email that he referred to in his testimony on direct examination. Kadel acknowledged that despite his concerns about the harm it might do to the company, employees, and him, he agreed to transfer BICC stock to a new company in connection with the sale of the four-percent interest of Polaris. However, he explained that it had not yet been determined whether the new company would be a subsidiary of Polaris. Kadel denied knowing what the cost would have been for the services Polaris performed for BICC. Kadel agreed that the BICC shareholder agreement included "family member" in the definition of "affiliate" and "former spouse" in the definition of "family member." Further, based on legal advice, Kadel and respondent abandoned their plan to transfer shares of

BICC to a new company. After consulting "legal and accounting and tax," Kadel concluded that there was no way to easily transfer the shares. He never formally approached BICC about the transfer as "it didn't make business sense to do it."

¶ 28    On redirect-examination, Kadel testified that the membership purchase agreement between him and respondent did not allow for the transfer of BICC stock directly to either of them. It allowed for transfer to a new entity; however, ultimately, that entity was never created.

¶ 29    On recross-examination, Kadel stated that he had informal conversations with Jeff Bohnson (BICC's CEO), regarding transferring the shares in 2017 or 2018. He believed that his conversations with Bohnson occurred prior to the time Bohnson sent an email to petitioner's attorney stating he did not believe transferring shares to petitioner would be a problem. Even if it were possible to transfer the BICC shares to petitioner in accordance with BICC's policies and rules, Kadel would not consent to the transfer due to the effect it would have on Polaris. Kadel answered "I don't know" when asked whether he would continue to "buy out [respondent's] interest in Polaris." When asked whether this would extinguish respondent's interest in the BICC stock, Kadel stated that respondent had no interest in the BICC stock, but it would extinguish respondent's interest in Polaris.

¶ 30    Respondent next called Bohnson. Bohnson testified that respondent owned no shares of BICC. When asked, "Is it possible for a person who doesn't own any shares in BICC to transfer shares in BICC," he replied, "I wouldn't know how that would happen, but I doubt it." Polaris owns shares of BICC, and respondent has an ownership interest in Polaris. It was Bohnson's understanding that no share of BICC could be offered to someone besides an initial shareholder without first offering those shares to existing shareholders.

¶ 31    On cross-examination, Bohnson identified an email he sent to petitioner's attorney in January 2019, about a month before the trial. In it, he states that he did not believe that transferring BICC stock to petitioner would be "much of a problem." However, the email also states that Bohnson needed to consult with his attorney about the transfer. Bohnson stated that the stock was, in fact, not transferable without amending BICC's operating agreement. He added that he "spoke too soon" in his email. The only holders of common stock are Bohnson and Polaris. Polaris does not "have a vote on anything with their shares of stock."

¶ 32    Bohnson estimated the services Polaris performed for BICC were worth $700,000. However, Polaris received the shares of BICC stock it now owns instead of a cash payment. The shares Polaris owns today are the shares it received for completing this contract (Polaris subsequently had a second contract with BICC for which it was paid cash). Bohnson did not recall ever getting anything in writing or otherwise from respondent, Polaris, or Kadel concerning transferring shares of BICC stock.

¶ 33    Respondent then attempted to call petitioner's attorney. The trial court denied the request. It explained that there had been an agreed motion to exclude witnesses and respondent never sought to have petitioner's attorney excluded as a witness. Respondent had no further witness pertaining to the issue concerning the transfer of stock.

¶ 34    Petitioner then called respondent. Respondent acknowledged signing the MSA on May 5, 2016. On that day, respondent stated he would attempt to transfer shares of BICC stock to petitioner. Respondent acknowledged that he had been doing work for another client, Alpine Energy, prior to the entry of the dissolution judgment. He stated that he would not have entered into the MSA if he had not believed he could transfer the BICC stock. Pursuant to the MSA, he had 30 days to transfer the stock, if a transfer was possible. After the dissolution judgment was

entered, he reviewed the stockholder's agreement to see if the transfer could be effectuated. He agreed that a transfer to an affiliate was not subject to the right-of-first refusal provision. However, he added that petitioner was not an affiliate.

¶ 35    After the sale of the four-percent interest in Polaris to Kadel, Polaris's operating agreement was amended to require a supermajority of two-thirds of all percentage interests for certain decisions, while there were decisions that Kadel could make unilaterally. Respondent acknowledged that he and Kadel could agree to anything they wished to as it related to Polaris. Petitioner's counsel asked, "What is to keep you and Mr. Kadel from entering into an agreement not to pay out that money" represented by the BICC stock owned by Polaris. Respondent replied that his interpretation of the MSA would require him to make a payment to petitioner if the BICC stock could be transferred or if it could be sold. He added that if it could be sold, under the MSA, it must be sold.

¶ 36    Respondent acknowledged that, in accordance with the MSA, he was required to provide petitioner with all documents pertaining to BICC within 3 days. However, he did not tender the amendment to Polaris operating agreement until January 2019 despite it being generated in September 2017 or the amendment to the purchase agreement between him and Kadel, which was generated in November 2017. Respondent acknowledged that this was true of several other documents.

¶ 37    On cross-examination by his own counsel, respondent testified that the amended stockholders agreement was tendered prior to the entry of the dissolution judgment. Polaris never transferred any shares of BICC to anyone, and no new company was ever formed to hold BICC shares. Alpine Energy was not a client of Polaris at the time of the dissolution judgment; it was "spun off" a client, Nordic Energy. Nordic compensated them by a fee arrangement.

¶ 38    Respondent testified that he first approached Kadel about transferring the BICC stock to petitioner shortly after the entry of the dissolution judgment. He made this request orally, as he and Kadel spoke several times per day. He asked Kadel again before he sent the email on July 8, 2016, informing petitioner that he could not transfer the stock.

¶ 39    He never informed petitioner about any capital calls being made on the BICC stock because none, in fact, were ever made. Respondent testified that he does not have the ability to sell the BICC stock. Respondent admitted that he never attempted to sell his interest in the BICC stock (which he holds by virtue of his interest in Polaris) to Kadel. Respondent added that the MSA states that the stock must be transferred if it can be transferred and "if it can't, then this is what happens." He regarded the MSA as clear on this point.

¶ 40    Before proceeding further, the trial court found that the rule should issue regarding the first count of the petition for a rule to show cause—that respondent failed to provide documents related to BICC within three days in accordance with the judgment for dissolution.

¶ 41    Respondent then testified regarding the first count. He acknowledged that the dissolution judgment required that he tender documents pertaining to BICC stock to petitioner. He identified an email he sent on November 28, 2016, with a link to where petitioner could download certain such documents. He sent it within three days of receiving the documents. These documents were a profit-and-loss statement, balance sheet, and cash-flow statement for BICC. He also tendered documents to petitioner on February 9, 2017, April 19, 2018, and September 30, 2018. Respondent testified that he was aware of no other documents that he should have tendered to petitioner.

¶ 42    On cross-examination, respondent agreed that an order had been entered on December 3, 2018, requiring him to produce a list of documents by December 31, 2018. He produced them on January 3, 2019. One document was a letter dated July 26, 2016, authored by Kadel, stating he

was resigning from BICC (Kadel had been a board member). Another, also dated July 26, 2016, was a partial termination letter between Polaris and BICC. Respondent noted that trying to get all the documents together was "overwhelming." In fact, all of the documents tendered on January 3, 2019 were from 2016 and concerned BICC.

¶ 43   Finally, the trial court heard evidence on the third count of the petition for a rule to show cause. Respondent again took the stand. He acknowledged that in September 2017, he sold a percentage of his ownership interest in Polaris to Kadel. Under the terms of the dissolution judgment, he was required to pay petitioner a percentage of his income. The dissolution judgment states that additional child support would be based on wages, bonuses, commissions, Code D distributions from Form K-1, Box 16, and other distributions respondent received by virtue of his ownership interest in an S-Corporation or other similar monies from different corporate entities. Respondent admitted that he did not tender the document concerning this sale to petitioner until January 3, 2019. He received $166,000 for this sale, and he did not pay child support on this sum. Based on this testimony, the trial court found that the rule should issue and that the burden shifted to respondent to show that his behavior was not contumacious.

¶ 44   On examination by his counsel, respondent testified that the $166,000 he received from the sale was neither wages, a bonus, a distribution a commission, nor did it have anything to do with Form K-1. Rather, this was the sale of a capital asset. The dissolution judgment does not require him to pay child support based on such a sale.

¶ 45   On examination by the trial court, respondent explained that a Code D distribution from Form K-1, Box 16 distribution was a distribution from a limited liability company. Polaris is such a company.

¶ 46    On examination by petitioner's counsel, respondent was asked whether he received this money by virtue of his ownership interest in an S-Corporation. Respondent replied that it was the result of his selling such an interest. Respondent later explained this money did not represent a distribution he received from Polaris.

¶ 47    The trial court issued a written ruling. It found that at the time of the entry of the dissolution judgment, both parties agreed that BICC stock was to be divided within 30 days. It found respondent's "testimony regarding the transfer of stock not credible." It noted that respondent made "no efforts which were in compliance with the exhibits entered into evidence." Moreover, "He knowingly reduced his interest in Polaris to give his partner a majority shareholder position to further reduce the possibility of any compliance with the transfer." The trial court then turned to the three counts of the petition for rule to show cause.

¶ 48    Regarding the first, the failure to tender documents in a timely fashion, the trial court first observed that respondent admitted that he never tendered certain BICC documents to petitioner. Many documents generated in 2016 were not tendered until January 2019.

¶ 49    Regarding the second, the failure to transfer the BICC stock, the trial court noted that at the time of the dissolution judgment, respondent owned 50% of Polaris. Respondent testified that he reviewed the Polaris stockholders' agreement shorty after entry of the judgment and then requested permission from Kadel to transfer the stock. The trial court found that this testimony was undermined by Kadel's testimony that he did not recall respondent making such a request prior to November 2016. Respondent stated that he made oral requests of Kadel to transfer the stock, but did not make a written request. Respondent claimed he could not transfer the stock because Kadel did not agree.

¶ 50    The trial court noted Kadel's testimony that he did not agree to transfer the stock due to the effect it would have on Polaris. It observed that in connection with the sale of four percent of respondent's interest in Polaris to Kadel, the BICC stock was to be transferred to a new company. The trial court stated, "It appears that Mr. Kadel and [respondent] were willing to transfer the shares to an unknown company, just not to [petitioner]."

¶ 51    Further, the trial court noted that respondent testified that he believed the stock was not transferrable in accordance with BICC's operating agreement, but the document does allow transfers that "are made in compliance with the agreement." Compliance includes a written request to BICC, which the trial court observed was never made.

¶ 52    The trial court further found the respondent reduced his position in Polaris, thereby becoming a minority shareholder and allowing Kadel to make some decisions unilaterally.

¶ 53    Bohnson testified that the value of the work performed by Polaris for BICC was $700,000. He also testified that he never received a written request from respondent to transfer the stock to petitioner. Finally, the trial court found that Bohnson was impeached in that, though he claimed the stock was not transferrable on the stand, he stated in an email to petitioner's counsel that it was.

¶ 54    Regarding the third count, the failure to provide documentation regarding his income, the trial court found that respondent failed to tender documents concerning his sale of his interest of Polaris in a timely manner.

¶ 55    The trial court then concluded:

          "The Court finds James Morrison engaged in a course designed to frustrate the clear

          intent of the Marital Settlement Agreement, and that his conduct was and continues to be

          willful, contumacious and without legal justification. He had the ability to transfer the

stocks and his willful refusal to accomplish same, as well as his refusal to tender documentation to Jennifer which would have shown his lack of efforts and direct efforts to avoid his obligations, prolonged this litigation and incurred unnecessary and extraordinary attorney's fees and costs.

The Court finds James Morrison had the ability to transfer the stock and willfully failed to do those acts necessary to accomplish the transfer. The Court finds this conduct to will [*sic*] and contemptuous and he is found to be in Indirect Civil Contempt of Court. The Order of the Court is attached."

Accordingly, the trial court held respondent in indirect civil contempt for failing to provide documents relating to BICC per the judgment, transfer the BICC stock, and provide documentation regarding his sale of four percent of his interest in Polaris to Kadel. It ordered respondent to transfer the stock or pay petitioner $175,000 and provide documentation regarding the sale of a portion of his interest in Polaris.

¶ 56    Respondent moved the trial court to reconsider. In denying this motion, the trial court explained that its primary basis for doing so was respondent's failure to make a reasonable attempt to transfer the shares as required by the dissolution judgment. This appeal followed.

¶ 57                                III. ANALYSIS

¶ 58    On appeal, respondent first argues that he is presently unable to transfer the BICC shares to petitioner. He next argues that the trial court erred in holding him in indirect civil contempt for failing to effect that transfer. Finally, he challenges the trial court's finding that he was in contempt for failing to turn over various documents.

¶ 59    Before proceeding to the merits, we note that the following standards of review apply in this appeal. Factual determinations, as always, are reviewed using the manifest-weight standard.

*Corral v. Mervis Industries, Inc.*, 217 Ill. 2d 144, 154 (2005). Further, a contempt finding presents a question of fact. *In re Marriage of McCormick*, 2013 IL 120100, ¶ 17. A finding is contrary to the manifest weight of the evidence only if an opposite conclusion is clearly apparent. *Svenson v. Miller Builders, Inc.*, 74 Ill. App. 3d 75, 83 (1979). Construing a document such as a contract or MSA presents a question of law, subject to *de novo* review. *Eychaner v. Gross*, 202 Ill. 2d 208, 252 (2002). Finally, "It is well settled that on appeal all reasonable presumptions are in favor of the action of the trial court and that the burden is on the appellant[, here respondent,] to show affirmatively the errors assigned on review." *In re Estate of Elson*, 120 Ill. App. 3d 649, 656 (1983).

¶ 60                           A. Transferring the BICC Shares

¶ 61    Respondent first argues that he lacks the ability to transfer the BICC shares. This presents a question of fact. See *Lease Resolution Corp. v. Larney*, 308 Ill. App. 3d 80, 91 (1999). Factual determinations are reviewed using the manifest-weight standard. *Corral*, 217 Ill. 2d at 154.

¶ 62    Respondent first contends that the BICC shares are owned by Polaris rather than by him. He notes that the Polaris operating agreement explicitly prohibited Polaris from making a noncash distribution, so he could not demand that the shares be transferred to him. Moreover, any transfer, even if the shares were to be treated as a cash asset, required Kadel's consent, and Kadel refused to give it.

¶ 63    However, as the trial court noted, respondent and Kadel did contemplate transferring shares to a newly formed company, so a transfer was not *per se* impossible. This finding is supported by the record. Moreover, respondent repeatedly points to Kadel's testimony that he would not approve a transfer to petitioner. Of course, the trial court, as trier of fact, is free to disregard the testimony of any witness, even where it is unrebutted. *Kraft Foods, Inc. v. Illinois Property Tax Appeal*

*Board*, 2013 IL App (2d) 121031, ¶ 58; *Franciscan Communities v. Hamer*, 2012 IL App (2d) 110431, ¶ 47. Further, Kadel's testimony was impeached by his willingness to transfer these assets to a new company.

¶ 64    The trial court then focused on respondent's efforts to effectuate a transfer and found them lacking. Indeed, the MSA stated, "If possible, JAMES shall transfer to JENNIFER her share of the stock rights within thirty (30) days from entry of this Agreement." The trial court observed that respondent's testimony that he made oral requests to effectuate a transfer shortly after entry of the dissolution judgment was contradicted by Kadel's testimony that that he did not recall respondent making such a request prior to November 2016.

¶ 65    Indeed, a contract requires a party vested with discretion to exercise it reasonably and in good faith. *Reserve at Woodstock, LLC v. City of Woodstock*, 2011 IL App (2d) 100676, ¶ 42. An MSA is a contract. *In re Marriage of Mulry*, 314 Ill. App. 3d 756, 758 (2000). The trial court could infer that by requiring respondent to transfer them "if possible," the MSA contemplated that respondent would make a reasonable effort to effect a transfer so it could be determined if one were actually possible. In turn, the trial court could reasonably find that by failing to make such an effort, respondent violated the MSA.

¶ 66    Respondent also points to the right of first refusal in the BICC operating agreement. He suggests that if Polaris were to attempt to transfer the shares to petitioner without consideration, any BICC shareholder could exercise that right essentially for free. We note that the only holders of the BICC stock are Polaris and Bohnson. There is no indication the respondent ever approached Bohnson to see whether he would exercise that right if possible or if there were some way to ensure that the stock could be transferred to petitioner. In fact, when first approached by plaintiff's counsel, Bohnson qualifiedly believed that the stock could be transferred to petitioner. Later, he

stated that the stock could not be transferred "without making an amendment to the existing operating agreement." He did not, however, state that such an amendment was impossible, and there is no indication that respondent approached Bohnson about effectuating a transfer in this manner. We also note that respondent made no attempt to sell any shares to another shareholder, as would be permitted by the agreement. Moreover, the trial court questioned Bohnson's credibility.

¶ 67    As noted, the burden on appeal is on the appellant to establish error before the trial court. *Elson*, 120 Ill. App. 3d at 656. Here, we cannot say that an opposite conclusion to the trial court's that respondent failed to make reasonable efforts to transfer the stock, as contemplated by the MSA, is clearly apparent. Quite simply, while there may have been obstacles to such a transfer, respondent has neither established that it would have been impossible nor that he made a reasonable effort to do so.

¶ 68                              B. CONTEMPT

¶ 69    Respondent makes several subarguments as to why the trial court erred in holding him in indirect civil contempt. We will address them in the order they are presented in respondent's brief.

¶ 70                              1. *Prima Facie* Case

¶ 71    Generally, a party seeking a contempt order must first establish a *prima facie* case of contempt. *In re Marriage of Ray*, 2014 IL App (4th) 130326, ¶ 15. If the party is successful, the burden shifts to the other party to justify his or her actions. *Id*. Respondent argues that petitioner failed to make out a *prima facie* case that he violated the MSA.

¶ 72    Respondent asserts that petitioner never showed he had the ability to transfer the shares so he cannot be held in contempt for not transferring them. However, the trial court found that the MSA required respondent to make a reasonable effort to do so, and we read of the MSA in the

same manner. That is, it cannot be known whether the transfer was possible unless respondent attempted to transfer them, as required by the MSA, within 30 days of the dissolution judgment. Generally, a respondent who makes a reasonable effort to comply with a court order will not be held in contempt. Rather, "A party who understands the court's order but chooses to ignore the mandate is guilty of contempt of court." *Killion v. City of Centralia*, 381 Ill. App. 3d 711, 715 (2008). Petitioner established a *prima facie* case by showing the respondent did not make reasonable efforts to transfer the BICC stock. See *Citronelle-Mobile Gathering, Inc. v. Watkins*, 943 F.2d 1297, 1301-02 (11th Cir. 1991).

¶ 73                              2. The Keys to Respondent's Cell

¶ 74     Respondent next complains that he does not hold the "keys to his jail cell," as is required when a party is held in indirect civil contempt. A characteristic of civil contempt is that the contemnor has the ability to purge the contempt by complying with the order, thereby terminating the sanction at issue. *In re Marriage of Betts*, 200 Ill. App. 3d 26, 44 (1990). Because the sanction is often imprisonment, this is known as possessing the keys to one's cell. *Id*. Respondent reiterates his argument that he lacks the ability to transfer the BICC stock here and therefore, he asserts, he lacks the ability to purge the contempt. We rejected this argument previously and find it no more persuasive here.

¶ 75     We also reject this argument for another reason. Quite simply, defendant does not have to transfer the BICC stock to comply with the trial court's order. The trial court set an alternate purge. Respondent may purge this contempt sanction by paying petitioner $175,000. In other words, respondent holds the key to his cell.

¶ 76                              3. The Alternate Purge

-22-

¶ 77    Defendant further contends that it was improper for the trial court to set an alternate purge of paying petitioner $175,000, as this constituted a *de facto* modification of the division of marital property. Indeed, section 502(f) of the Illinois Marriage and Dissolution of Marriage Act flatly states, "Property provisions of an agreement are never modifiable." 750 ILCS 5/502(f) (West 2016). Initially, we note that there has been no modification of respondent's obligations whatsoever. Trial court found that respondent has the ability to transfer the shares, and this finding is not contrary to the manifest weight of the evidence. Hence, respondent can still comply with the original order as contemplated. The trial court has merely provided respondent with an alternate means of complying with the original agreement by allowing him to buy out petitioner's interest in the shares.

¶ 78    The cases respondent relies on here are easily distinguishable. Respondent first cites *In re Marriage of Hubbard*, 215 Ill. App. 3d 113, 117-18 (1991). In *Hubbard*, the trial court ordered the respondent to pay for a portion of the costs of preparing the marital residence for sale (repairing a furnace). This court reversed, finding that despite having the power to enforce its own judgments, a trial court lacks the jurisdiction to engraft new obligations onto the judgment." *Hubbard*, 215 Ill. App. 3d at 117. In this case, there is no new obligation; petitioner is entitled to a portion of the BICC stock under the original MSA. Moreover, as noted, the trial court's order simply offers respondent a permissive alternative to transferring the stock. *Waggoner v. Waggoner*, 78 Ill. 2d 50 (1979) is similarly distinguishable. There, the supreme court explained:

> "The plaintiff by her motion seeks to compel the defendant to remove the judgment lien and the second-mortgage lien from the chain of title. The decree did not provide that the defendant was to perform these acts. Thus, the plaintiff does not seek to enforce the terms of the decree, but instead to engraft new obligations onto the decree." *Id.* at 53-54.

Unlike *Waggoner*, the trial court's order in this case involves no new obligation. Thus, respondent provides us with no authority analogous to the facts of this case.

¶ 79    In sum, we find this argument unpersuasive.

¶ 80                                    4. Valuation

¶ 81    Respondent next contends that there was no competent evidence that the value of petitioner's portion of the BICC stock was $175,000. Respondent points out that the only evidence of the value of the BICC stock was Bohnson's testimony that the BICC stock was transferred to Polaris in exchange for $700,000 worth of work that Polaris performed for BICC. An asset's value is a question of fact, and the trial court's valuation will not be disturbed unless it is against the manifest weight of the evidence. *In re Marriage of Grunsten*, 304 Ill. App. 3d 12, 17 (1999).

¶ 82    Respondent points out that the value of assets is determined by assessing their fair market value. 750 ILCS 5/503(k) (West 2016). "Fair market value" means "what a willing buyer would pay a willing seller in a voluntary transaction." *Grunsten*, 304 Ill. App. 3d at 17. Respondent asserts that the valuation of a corporation must "begin with [Internal Revenue Service] Revenue Ruling 59-60, and the principles contained therein." See *In re Marriage of Puls*, 268 Ill. App. 3d 882, 886 (1994). However, in proceedings such as these, we are not bound by the technicalities of federal tax law. *Cf. In re Marriage of Ackerley*, 333 Ill. App. 3d 382, 392 (2002) ("Moreover, in determining appropriate child support, we are not bound by the technicalities of federal income tax law.").

¶ 83    More to the point, respondent provides us no reason to suppose that the barter arrangement between BICC and Polaris was anything but an arm's length transaction whereby a quantity of stock was exchanged for services of equal value. Bohnson testified that the value of those services was $700,000, and no other evidence of their value exists in the record. Pursuant to the MSA,

petitioner is entitled to a fourth of the shares of BICC stock, making her share worth $175,000 (*i.e.*, $700,000 divided by 4 equals $175,000). Where the only evidence in the record supports the trial court's conclusion, it is impossible to say that the conclusion is contrary to the manifest weight of the evidence. Hence, we find no error in the trial court's valuation of petitioner's share of the BICC stock.

¶ 84    Finally, we note that respondent claims that there is no evidence in the record of his ability to pay petitioner $175,000. However, respondent's child-support obligation is based on a $270,000 salary—with provisions for earning in excess of that amount—and, since the dissolution judgment, respondent has sold a small portion of Polaris and raised $166,000. Thus, there is evidence in the record from which the trial court could infer that respondent has considerable means and that he either has or could raise this sum.

¶ 85                                    5. The Documents

¶ 86    Respondent next challenges the trial court's contempt findings pertaining to his failure to turn over documents related to BICC and documents related to his sale of four percent of Polaris to Kadel.

¶ 87                                  a. The BICC Documents

¶ 88    Respondent contends that the trial court erred in finding him in indirect civil contempt for his failure to turnover certain documents pertaining to the BICC stock in a timely manner. Respondent asserts that as of January 2019, all documents have been produced. Respondent further asserts, correctly, that a civil contempt order that does not provide the contemnor with an opportunity to purge his or her contempt must be reversed. *Continental Illinois National Bank v. Brach*, 71 Ill. App. 3d 789, 793 (1979). The trial court's order does not include a purge relating to the BICC documents. It provides:

> "A mittimus is issued directing that the said Respondent be taken into custody by the Sheriff of DuPage County and held until further order of Court, unless he shall purge himself of the said contempt by the following acts:
>
> > a. Transfer the BICC stock to Jennifer or pay Jennifer the sum of $175,000.00;
> >
> > **and** ( emphasis added)
> >
> > b. Provide documentation of the receipt of the $166,000.00 proceeds from his sale of 4% of Polaris, including documentation of the deposit of same and all bank statements from said account from the date of deposit through the date of this order."

The BICC documents are not mentioned. This is improper as there is no purge related to this contempt finding. *Id*. Therefore, we must reverse the trial court's finding of contempt as it pertains to respondent's failure to turn over the BICC documents.

¶ 89                                    b. The Sale Documents

¶ 90    Initially, respondent states that this portion of the contempt order should be reversed for the same reason as the portion pertaining to the BICC documents. However, he later admits that more documents exist but represents that they are outside the scope of his disclosure requirements. We will not make a blanket ruling on whether whatever such documents that may or may not exist fall within the scope of respondent's obligations. Such matters are best addressed by the trial court on remand if it is necessary to determine whether respondent has purged the contempt.

¶ 91    Similarly, it would be premature for us to address the question of whether the proceeds from the sale of four percent of Polaris to Kadel requires respondent to pay additional child support. Presumably, additional disclosures might reveal additional evidence relevant to this question.

¶ 92    Accordingly, we will not disturb the trial court's finding on this point. On remand, respondent remains free to make whatever additional disclosures, if any, he deems appropriate, and the trial court may address the question of whether respondent has purged his contempt. Petitioner may then take any appropriate actions based on those possible disclosures.

¶ 93                              IV. CONCLUSION

¶ 94    In light of the foregoing, we reverse the trial court's contempt finding pertaining to respondent's untimely disclosure of the BICC documents, and we otherwise affirm its ruling. This cause is remanded for further proceedings consistent with this order.

¶ 95    Affirmed in part and reversed in part; cause remanded.